Stephen D. LITTLE and Kathryn L. Dietz, Plaintiffs and Appellants,

v.

Nicholas J. SPAETH, officially in his capacity as Attorney General and individually, and the State of North Dakota, Defendants and Appellees.

Civ. No. 11184.

Supreme Court of North Dakota.

Oct. 17, 1986.

Rauleigh D. Robinson, Bismarck, for plaintiffs and appellants.

Christine Hogan, Sp. Asst. Atty. Gen., Bismarck, for defendants and appellees.

ERICKSTAD, Chief Justice.

Little and Dietz have appealed from a partial summary judgment[1] dismissing several claims in an action they filed as a result of their termination as assistant attorneys general. We affirm.

On the second working day of his term as Attorney General, Spaeth dismissed Little and Dietz from their positions as assistant attorneys general. Little and Dietz asserted that they were classified employees[2] and could only be dismissed for cause.

1. The judgment contains "an express determination that there is no just reason for delay and ... an express direction for the entry of judgment." Rule 54(b), N.D.R.Civ.P.

2. Section 54–44.3–20, N.D.C.C., provides:
    "*54–44.3–20. Categories of positions in the state service.* All positions in the state service are included in the classified service except:
    \*       \*       \*       \*       \*       \*

None of the reasons given by Spaeth for the dismissals related to activities that occurred after Spaeth's term commenced.

Little and Dietz filed employee grievance forms, which Spaeth forwarded to the director of the Central Personnel Division, along with a letter stating, among other things:

"The Office of Attorney General is not subject to the North Dakota Personnel Policies Manual and therefore is not bound by the employee grievance procedures promulgated by the Central Personnel Division...."

The State Personnel Board did not conduct hearings to review the dismissals of Little and Dietz.

Little and Dietz brought suit, alleging five general causes of action: (1) political firing; (2) violation of the plaintiffs' First Amendment rights to free speech; (3) deprivation of the plaintiffs' property rights to employment without due process of law in violation of the Fifth and Fourteenth Amendments; (4) breach of contract; and (5) defamation. Each of the first three causes of action was asserted as: (1) a direct cause of action under the United States Constitution; (2) a federal cause of action based upon 42 U.S.C. § 1983; and (3) a state cause of action arising out of contract.

Within each cause of action the plaintiffs asserted that they were former classified employees, that they were not provided with appropriate pre-termination and post-termination due process procedures, and that:

"15.

"Cause did not exist for terminating the plaintiffs from their employment al-

"8. Positions deemed to be inappropriate to the classified service due to the special nature of the position as determined by the division and approved by the board."
    No attempt had been made to except assistant attorneys general from the classified service under subdivision 8 and none of the other exceptions were applicable to the plaintiffs.

though it is required by the Central Personnel Division Policies.

"16.

"The plaintiffs, as classified employees, had a property interest in their employment with the State. The Central Personnel Division Policies enumerating employment rights constitutes a contract between that State and its classified employees."

The trial court granted the defendants a partial summary judgment dismissing most of the plaintiffs' claims. In their appeal, Little and Dietz have raised the following issues:

"DID THE DISTRICT COURT ERR IN DISMISSING ALL CAUSES OF ACTION IN THE COMPLAINT EXCEPT THOSE NOT ARISING FROM CONTRACT IN THE FIRST AND SECOND CAUSES OF ACTION AGAINST DEFENDANT SPAETH PERSONALLY, AND IN DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT?

"A.   Whether the North Dakota State Personnel Policies created a contract of employment between the Plaintiffs and the State and, if so, whether that contract was breached by the Defendants?

"B.   Whether the Plaintiffs had a property right to their employment and, if so, whether their constitutional right to due process was violated by Defendants when Plaintiffs were deprived of that property right?

"C.   Whether any actions by Plaintiffs, which occurred prior to January 1, 1986, could, as a matter of law, constitute cause for Plaintiffs' termination.

"D.   Whether Plaintiffs' Complaint supports a cause of action for defamation against Defendant Spaeth, individually, and, if so, whether Plaintiffs were defamed per se as a matter of law?

"E.   Whether the Defendants possess qualified or sovereign immunity for damage claims asserted in the Complaint?"

The parties do not assert that there are genuine issues as to any material fact that preclude summary judgment. In essence, each party asserts the right to summary judgment as a matter of law.

In *Hammond v. North Dakota State Personnel Bd.*, 332 N.W.2d 244, 250–51 (N.D.1983) [*Hammond I*], we held that the Central Personnel Division was authorized to create a statewide appeal mechanism to allow the State Personnel Board to review dismissals of classified employees:

"Upon examining Section 54–44.3–12.2, N.D.C.C., in view of the legislative history of House Bill No. 1042, we believe the legislative intent was to authorize an appeal mechanism for all classified state employees through which they could obtain a review of personnel actions including dismissals. We further construe the legislative intent under Section 54–44.3–12.2, N.D.C.C., as authorizing the Central Personnel Division to include, as part of the statewide appeal mechanism, a review of personnel actions by the State Personnel Board under the Board's general authority 'to foster and assure a system of personnel administration in the classified service of state government' and to 'hold such hearings' as are necessary to perform the functions vested in the Board by law. Consequently, we construe the broad and general authority given the Board under Section 54–44.3–07, N.D.C.C., together with the legislative authorization for a statewide appeal mechanism under Section 54–44.3–12.2, N.D.C.C., as authorizing the State Personnel Board, upon development and implementation of the statewide appeal mechanism by the Central Personnel Division, to review all personnel issues subject to review under that mechanism."

We also held, *id.* at 251, that Chapter 9 of the North Dakota Personnel Policies manual implemented the statewide appeal mechanism authorized for review of dismissals.

At the time of plaintiffs' dismissals, Chapter 8 of the North Dakota Personnel Policies manual provided:

"The appointing authority may dismiss an employee for inefficiency, insubordination, misconduct, or other cause. A written statement of reasons for the dismissal shall be submitted to the employee. A permanent employee shall have the right to appeal."

Chapter 9 of the manual provided the appeal procedures.

Little and Dietz assert that, under our decision in *Hammond v. North Dakota State Personnel Bd.*, 345 N.W.2d 359 (N.D. 1984) [*Hammond II*], the North Dakota Personnel Policies manual constituted a contract of employment between the State and its classified employees. We deem it appropriate to quote our decision in that case at length:

"We take judicial notice that no portion of the Manual has been published in the North Dakota Administrative Code. Consequently, it is questionable whether or not the Manual provisions have been properly promulgated as agency rules. *See*, Section 28–32–03, N.D.C.C.; *see also, Hammond v. North Dakota State Personnel Board*, 332 N.W.2d 244 (N.D. 1983) (Justice VandeWalle specially concurring). However, that issue has not been raised or briefed by either party. Irrespective of whether or not the Manual provisions constitute validly promulgated agency rules, we conclude that they are binding as a part of the employment relationship between the State Laboratories Department and Howard Hammond. The Manual, which was published and implemented by the Central Personnel Division, was held out by the State as providing the 'policy and procedure' for state employees in their employment relationships with state agencies.

\*     \*     \*     \*     \*     \*

"The State, and more specifically the State Laboratories Department in this case, having promulgated the Manual provisions as its personnel policy and procedure, must be held accountable under those provisions in its employment relationship with Howard Hammond.

"... We conclude in this case that the provisions of the Manual, under which the parties have voluntarily operated, provided the standard by which Hammond's termination must be reviewed...." (Citations omitted.) *Hammond II, supra*, 345 N.W.2d at 360–61.

It is important to note that in *Hammond II*, a formal hearing was held before a hearing examiner appointed by the State Personnel Board and that "[i]t is undisputed that Seifert, the hearing examiner, and the Board acted under the provisions of and in accordance with the rights and procedures set forth in the Manual." *Hammond II, supra*, 345 N.W.2d at 360.

In *Hammond II*, as we have already noted herein, we took judicial notice of the fact that no portion of the personnel policies manual had been published in the North Dakota Administrative Code; noted that "it is questionable whether or not the Manual provisions have been properly promulgated as agency rules" (345 N.W.2d at 361); noted that "that issue has not been raised or briefed by either party" (345 N.W.2d at 361); said that "[i]rrespective of whether or not the Manual provisions constitute validly promulgated agency rules, ... they are binding as a part of the employment relationship between the State Laboratories Department and Howard Hammond" and finally held that "[w]e conclude *in this case* that the provisions of the manual, under which the parties have voluntarily operated, provided the standard by which Hammond's termination must be reviewed." [Emphasis added.] *Id.* at 361.

■ The issue of the validity of the personnel policies relied upon by the plaintiffs has been raised and briefed by the defendants. Among other things, § 28–32–02, N.D.C.C., requires that "[e]very rule proposed by any administrative agency shall be submitted to the attorney general for an opinion as to its legality before final adoption." Section 28–32–03(1), N.D.C.C., provides, with an exception not relevant here,

that "rules not published in the [North Dakota] administrative code shall be invalid." Because the personnel policies relied on by Little and Dietz were not submitted to the Attorney General for an opinion prior to their adoption and were not published in the North Dakota Administrative Code, they were invalid. Although the personnel policies had been adopted by the Central Personnel Division, they were not binding, therefore, upon the Office of the Attorney General.[3]

■ Little and Dietz have asserted that while they were employed in the Office of the Attorney General their positions were classified in accordance with classifications established by the Central Personnel Division; that they were paid and received benefits in accordance with their classifications; and that the rate at which they accumulated annual leave and sick leave was "in compliance with Central Personnel Policies." Although it might be argued that Attorney General Robert O. Wefald may have bound himself or may have held out the personnel policies manual, we are not convinced from his affidavit, in light of the language of the Little and Dietz appointments, that he did so equivalent to the holding out in *Hammond II.* In any event, Little and Dietz have not drawn our attention to anything in the record indicating that Attorney General Nicholas J. Spaeth has ever "held out" or "voluntarily operated under" the North Dakota Personnel Policies manual upon which they rely so as to be bound by them under the rationale of *Hammond II.*

Because the North Dakota Personnel Policies manual relied upon by the plaintiffs as creating an employment contract under which they could be dismissed only for cause had never been validly promulgated as required by Ch. 28–32, N.D.C.C., and the plaintiffs have not shown that the manual had ever been held out or voluntarily operated under by Attorney General Spaeth so as to be binding as a part of the employment relationship between the plaintiffs and the Attorney General despite the invalidity of the policies, we conclude that the North Dakota Personnel Policies manual did not provide the plaintiffs with any contractual employment rights. Therefore, Little and Dietz did not have a contractual right to continued employment as assistant attorneys general unless dismissed for cause. The trial court, therefore, did not err in entering summary judgment dismissing the plaintiffs' cause of action for breach of contract.

Our determination that the plaintiffs did not have a contractual right to employment also disposes of their assertions that they were deprived of property without due process of law in violation of the United States Constitution, because their "federal constitutional claim depends on their having had a property right in continued employment." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, ——, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494, 501 (1985). That determination also disposes of the plaintiffs' claims under 42 U.S.C. § 1983 because, as they asserted in their brief to this court, "[p]laintiffs' claims against the State and Spaeth, in his official capacity, originate from the breach of a contractual relationship." [4]

---

**3.** Thus at the time of the plaintiffs' dismissals the legislative intent, which we found in *Hammond I, supra,* 332 N.W.2d at 250, "to authorize an appeal mechanism for all classified state employees through which they could obtain a review of personnel actions including dismissals," had not yet been realized.

Unlike gubernatorial appointees required by executive order to adhere to the North Dakota Personnel Policies (see *Hammond II, supra,* 345 N.W.2d at 361), the Attorney General is not required to adhere to them unless they are properly promulgated, which requires, among other things, an approving opinion from the Attorney General.

**4.** Our determination that the North Dakota Personnel Policies did not provide the plaintiffs with any contractual employment rights renders it unnecessary for us to address the defendants' assertion that public policy requires that the Attorney General have the discretion to appoint and remove those assistants he deems necessary in order to carry out his responsibilities. That determination also renders it unnecessary to address the defendants' assertion that "from … references in the state personnel policies to 'ap-

Little and Dietz assert that their complaint supports a cause of action for defamation against Spaeth, individually, and that they were defamed as a matter of law. They alleged in their complaint:

"Defendant Spaeth dismissed the plaintiffs from their positions as classified employees of the State. Although no cause existed to justify plaintiffs' dismissal, cause was in fact required and asserted by defendant Spaeth. Additionally, since at the time of plaintiffs' dismissal it was the legal position of the State of North Dakota that classified employees could be dismissed only for cause, the only inference which could be drawn from plaintiffs' dismissal was that it was based on cause. Therefore, in dismissing plaintiffs, defendant Spaeth defamed them, impairing their reputation and standing in the community and causing them personal humiliation as well as mental anguish and suffering."

As we have already determined, the plaintiffs had no contractual right to employment absent dismissal for cause. Thus, cause was not required for dismissal and dismissal based on cause was not the only inference which could be drawn from the plaintiffs' dismissal. The dismissal itself was not defamatory and the trial court did not err in dismissing the defamation cause of action pleaded in the complaint.

Little and Dietz also assert:

"In the instant action, Spaeth published at least three separate defamatory statements against each of the Plaintiffs. When Spaeth called the Plaintiffs together into Plaintiff Dietz's office on January 3, 1985, he told the Plaintiffs that he had chosen to not renew each of their appointments as Assistant Attorneys General because other lawyers in the Attorney General's Office had trouble working with them.

"Later that afternoon, Spaeth furnished the Plaintiffs with letters indicating that he had taken the action because each of the Plaintiffs had unjustifiably absented himself or herself from the office too frequently and each of the Plaintiffs had failed to carry his or her fair share of the office's workload. In addition, Spaeth's letter to Plaintiff Dietz stated that she had 'adopted an unnecessarily abrasive and uncooperative attitude in litigation that has alienated members of the Bar....' (App. p. 111). In addition to Spaeth's statements being communicated to the stenographer who typed the letters, the letters themselves are public documents available at any time for inspection by any member of the general public. *See:* Section 44–04–18, N.D.C.C.

"In a March 8, 1985, newspaper interview, Spaeth said the Plaintiffs had been dismissed because, 'I didn't think that they were performing to my level of expectation.' Defendant Spaeth's comment was republished in newspapers throughout North Dakota. (App. p. 75 & 120)."

In asserting that Spaeth defamed them, Little and Dietz rely upon § 14–02–02, N.D.C.C.; § 14–02–03, N.D.C.C., and part of § 14–02–04, N.D.C.C. Section 14–02–02, N.D.C.C., classifies defamation as either libel or slander. Section 14–02–03, N.D.C.C., provides:

"*14–02–03. 'Civil libel' defined.* Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation."

The part of § 14–02–04, N.D.C.C., upon which Little and Dietz rely, states:

"*14–02–04. 'Civil Slander' defined.* Slander is a false and unprivileged publication other than libel, which:

\* \* \* \* \* \*

pointed agency director,' it is clear that the policies were designed and written to apply only

to *appointed* agency heads, not *elected* officials."

"3. Tends directly to injure him in respect to his office, profession, trade, or business, ... by imputing to him general disqualifications in those respects which the office or other occupation peculiarly requires, ..."

Spaeth's alleged statement in Dietz's office that he had chosen not to renew the plaintiffs' appointments "because other lawyers in the Attorney General's Office had trouble working with them" does not impute to the plaintiffs general disqualifications in those respects which their occupation peculiarly requires. Section 14–02–04(3), N.D.C.C. The language used is not "fairly susceptible of a defamatory meaning." *Moritz v. Medical Arts Clinic, P.C.*, 315 N.W.2d 458, 460 (N.D. 1982), *quoting Lauder v. Jones,* 13 N.D. 525, 101 N.W. 907 (1904).

Little and Dietz were the only other persons present when Spaeth made the statement. Neither of them has asserted that he or she held the other in lower esteem because of Spaeth's statement. "There can be no defamation unless the recipient of the communication believes it to be defamatory, *i.e.,* the plaintiff is defamed in the recipient's eyes." L. Eldredge, *The Law of Defamation* 44 (1978). Thus, since neither of the recipient's of Spaeth's statement about the other plaintiff has asserted that he or she understood the statement "in a defamatory sense" (Erickstad, C.J., concurring specially in *Moritz v. Medical Arts Clinic, P.C., supra,* 315 N.W.2d at 463) summary judgment of dismissal was proper.

With regard to the letters in which Spaeth stated his reasons for dismissing the plaintiffs, we note that, by asserting that the personnel policies were applicable to them, Little and Dietz implicitly asserted that they were entitled to have a written statement of reasons for their dismissals. The words used in the letters do not impute to either Little or Dietz any conduct which exposes them to hatred, contempt, ridicule, or obloquy, or causes them to be shunned or avoided, or tends to injure them in their occupation. Section 14–02–03, N.D.C.C.

*See also* Comment *e.* to § 573, *Restatement (2d) of Torts* (1977):

"*e. General disparagement.* Disparaging words, to be actionable per se under the rule stated in this Section, must affect the plaintiff in some way that is peculiarly harmful to one engaged in his trade or profession. Disparagement of a general character, equally discreditable to all persons, is not enough unless the particular quality disparaged is of such a character that it is peculiarly valuable in the plaintiff's business or profession."

Spaeth's statements about the plaintiffs' frequent absences from the office, their failure to carry a fair share of the office's workload, and Dietz's abrasiveness are not "peculiarly harmful to one engaged in" the plaintiffs' profession. The statements constituted "[d]isparagement of a general character, equally discreditable to all persons." The statements are not defamatory because they could not cause the results enunciated in § 14–02–03, N.D.C.C.

Spaeth's statement in a newspaper interview that "I didn't think that they were performing to my level of expectation," was made in response to receipt of a copy of the complaint filed by Little and Dietz in this action in which they alleged that Spaeth had dismissed them for political reasons, deprived them of their constitutional rights, breached their contracts of employment, and defamed them. In our view, the statement was made "[i]n the proper discharge of an official duty" and, therefore, privileged under § 14–02–05(1), N.D.C.C. The statement was made in response to allegations that Spaeth had acted improperly in dismissing the plaintiffs. Explaining his actions that led to a complaint against the State of North Dakota and Spaeth in his official capacity of Attorney General is a proper discharge of Spaeth's duties. *See Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959); *Hauser v. Urchisin,* 231 So.2d 6 (Fla.1970); *Hackworth v. Larson,* 83 S.D. 674, 165 N.W.2d 705 (1969).

We conclude that the trial court did not err in dismissing the plaintiffs' cause of action for defamation.

For the reasons stated, the partial summary judgment of dismissal is affirmed.

GIERKE, J., PEDERSON, Surrogate Justice, and HUNKE, District Judge.

PEDERSON, Surrogate Justice, and HUNKE, District Judge, sitting in place of LEVINE and MESCHKE, JJ., disqualified.

VANDE WALLE, Justice, concurring specially.

I agree with the result reached by the majority opinion but I write specially to explain my rationale as to why the holding in *Hammond v. North Dakota State Personnel Bd.*, 345 N.W.2d 359 (N.D.1984) [*Hammond II*], does not control this case and that partial summary judgment was proper.

Interestingly enough, in *Hammond II*, the defendant was the North Dakota State Personnel Board, not the State Laboratories Department nor its director by whom Hammond was employed. As the majority opinion notes, in *Hammond II* it was undisputed that the State Laboratories Department had promulgated the provisions of the North Dakota Personnel Policies Manual as its personnel policies and procedures. We concluded that the policies and procedures were a binding part of the employment relationship between the State Laboratories Department and Howard Hammond despite the fact those policies and procedures had not been adopted by the Personnel Board pursuant to Chapter 28–32, N.D.C.C., the Administrative Agencies Practice Act, and therefore did not have the force and effect of law.

In this instance the defendants are Nicholas Spaeth, in his capacity as Attorney General and individually, and the State of North Dakota. The plaintiffs allege that the policies manual has been held out to be a part of the employment relationship between them and the Attorney General. They support their allegations with an affidavit from Robert Wefald, Spaeth's prede-

cessor in office, in which he states that during his term as Attorney General "I considered all employees of the office of Attorney General, except the Deputy Attorney General and the office manager, to be classified State employees and treated such employees, at all times, in accordance with the State Personnel Policies."

Spaeth denies that the policies manual was a part of the employee relationship between the plaintiffs and the State and supports his allegations with copy of a memo from Wefald to his Assistant Attorneys General and Special Assistant Attorneys General indicating that their appointments will continue "until such time as it is specifically revoked by me or until such time as the particular matter you have been assigned to handle has been completed." Because this dispute raised an issue of fact, the dispute ordinarily would be sufficient to prevent summary judgment for either party despite the allegations in their motion and cross-motion for summary judgment that no factual disputes exist. Rule 56, N.D.R.Civ.P.; *Biby v. Union Nat. Bank of Minot*, 162 N.W.2d 370 (N.D. 1968).

In this instance, however, there is no allegation that Spaeth, as opposed to Wefald, operated under any policies manual. He held the office only one working day before dismissing the plaintiffs from their positions. The plaintiffs would extend the employment relationship they may have had with Wefald to Spaeth, but I do not believe that is a valid contention in view of the fact that the policies had not been adopted pursuant to Chapter 28–32, N.D. C.C., and therefore did not have the force and effect of law. Although the plaintiffs base this portion of their claim on contract, it is disingenuous to contend they had any form of contractual relationship with Spaeth, whatever their relationship might have been with his predecessor, Wefald.

Should it be contended that the State is also a defendant and that they have a contract with the State, regardless of who occupies the position of Attorney General, and that because such claim arises out of

contract it is not barred by sovereign immunity [see Article I, Section 9, North Dakota Constitution; Section 32–12–02, N.D.C.C.; *Kristensen v. Strinden,* 343 N.W.2d 67 (N.D.1983)], I note that *Hammond II* does not stand for such a proposition. Under the facts in *Hammond II,* Hammond's dismissal was sought by the very administration which it was conceded held out the policies to him as a part of the employment relationship.

Here, as noted above, there is no evidence or, for that matter, allegation that Spaeth held out the policies as part of the employment relationship or that the plaintiffs were to continue to be employed in his administration. Rather, the appointment by Wefald of the plaintiffs as Assistant Attorneys General specify they were to act in that capacity "until this appointment is revoked." That appointment, coupled with the authority provided by Section 54–12–06, N.D.C.C., to the Attorney General to appoint Assistant Attorneys General, belies any contention that Wefald could, if it was in fact his intention to do so, extend the employee relationship beyond his term in office in view of the fact the policies had not been adopted as rules and regulations pursuant to Chapter 28–32, N.D.C.C.

Although the termination of employment may thus be termed a failure to reappoint rather than a dismissal, the United States Supreme Court has stated that this is not a valid distinction for purposes of First Amendment analysis. See *Branti v. Finkel,* 445 U.S. 507, 512 n. 6, 100 S.Ct. 1287, 1291 n. 6, 63 L.Ed.2d 574, 580 n. 6 (1980); *Kristensen v. Strinden, supra.* However, the partial summary judgment does not dispose of the plaintiffs' causes of action relating to dismissal for political reasons and exercise of their First Amendment right to free speech and I understand those causes of action are yet to be tried.

In summary, *Hammond II* does not stand for the proposition that one elected official may, in the absence of statutes or rules and regulations to the contrary, form a contract relationship between the current employees of his or her office and future officials elected to that office. *Hammond II* applies, as a matter of contract, only to the administration holding out the personnel policies as a part of the employment relationship between that administration and its employees.[1]

PEDERSON, Surrogate Justice, concurs.

---

1. Apparently the policies and procedures now have the force and effect of law, having been approved by the Attorney General, and were effective December 1, 1985. See Chapter 59.5– 03–02 and Chapter 59.5–03–03, N.D.A.C. We were informed that by definition assistant attorneys general were not classified employees and therefore were excluded from coverage.