Salazar v. Morales 



TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-94-00336-CV







Ed Salazar, Appellant



v.



Dan Morales, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT


NO. 94-01717, HONORABLE ROBERT C. WRIGHT, JUDGE PRESIDING







 Appellant Ed Salazar sued Texas Attorney General Dan Morales, appellee, for
common-law defamation for statements Morales made to the press concerning Salazar's
termination as an assistant attorney general. Morales filed a plea to the jurisdiction based on
absolute immunity. The trial court granted the motion and dismissed the claim. This appeal
presents a single question: Is the Texas Attorney General entitled to absolute immunity from a
state-law defamation claim for comments made to reporters concerning the termination of an
employee? Concluding that he is, we will affirm the trial court's judgment.


FACTUAL AND PROCEDURAL BACKGROUND


 In a plea to the jurisdiction, the trial court must base its decision solely on the
allegations in the plaintiff's pleadings. Brannon v. Pacific Employers Ins. Co., 224 S.W.2d 466,
469 (Tex. 1949); Huston v. Federal Deposit Ins. Corp., 663 S.W.2d 126, 129 (Tex. App.Eastland 1983, writ ref'd n.r.e.). Factual allegations must be taken as true. Id. 
Accordingly, our description of the events surrounding this controversy is gleaned primarily from
Salazar's petition.

 Ed Salazar was employed as an assistant attorney general in the Consumer
Protection Division of the Texas Attorney General's office. As the result of an investigation,
Salazar determined that certain insurance companies were overcharging policyholders. (1) On
October 8, 1993, with the approval of his supervisors, Salazar filed three separate lawsuits against
State Farm, Allstate, and the Texas Farm Bureau Insurance Companies. Morales issued a press
release announcing the lawsuits and praising the work of the Attorney General's office in
protecting insurance consumers.

 In early November 1993, the head of the Consumer Protection Division urged
Salazar to end immediately the case against the Texas Farm Bureau Insurance Companies ("Farm
Bureau suit"). Because Salazar was involved in settlement discussions, he informed his
supervisors that an extremely favorable settlement of the Farm Bureau suit might compromise the
other lawsuits. On November 22, 1993, the head of the Consumer Protection Division instructed
Salazar to dismiss the Farm Bureau suit. On the same day, Salazar received a memorandum
informing him that he should look for another job.


 In the weeks following Salazar's termination, a number of other attorneys with the
Consumer Protection Division were also dismissed. These terminations attracted the attention of
reporters, who questioned Salazar about his dismissal. Salazar related to the reporters the
situation involving the Farm Bureau suit. On February 3, 1994, the Fort Worth Star-Telegram
reported that the Farm Bureau suit had been abruptly dropped and that Salazar, who had been in
charge of the case, had quit in protest rather than be fired. Following this article, a reporter for
the Associated Press asked Morales about Salazar's termination. (2) In his answer to the reporter's
questions, Morales characterized Salazar as a "disgruntled employee" who was not doing a good
job. Specifically, with respect to the Farm Bureau suit, Morales said: "This particular lawsuit was
one not authorized and not merited. He went out and filed it without authority from his
supervisors." Morales concluded: "We're going to continue to make decisions in similar fashion
in the future. When lawyers mess up in our agency, there will be consequences. It's as simple
as that." Morales's comments were subsequently reported in several Texas newspapers. (3)

 As a result of these statements made to the press, Salazar sued Morales and the
Attorney General's Office of the State of Texas on February 14, 1994. In his original petition,
Salazar alleged two causes of action: one for common-law defamation and one for wrongful
termination under Sabine Pilot Service, Inc. v. Hauck, 687 S.W.2d 733 (Tex. 1985). Morales
responded with a plea to the jurisdiction based on immunity. Before the trial court's hearing on
the jurisdictional challenge, Salazar non-suited the Attorney General's Office. He also amended
his petition, dropping the Sabine Pilot wrongful termination claim against Morales, but adding
a civil rights claim under 42 U.S.C. § 1983.

 Following a hearing on April 14, 1994, the trial court severed the federal civil
rights claim. (4) The court then granted Morales's plea to the jurisdiction on immunity grounds and
dismissed the state-law defamation claim. In a single point of error, Salazar contends the trial
court erred in dismissing his defamation suit because Morales is not entitled to absolute immunity
from such claims.


DISCUSSION


 The issue of absolute immunity for high-ranking state officials to publish
defamatory material in the performance of their duties is one of first impression for Texas courts. 
However, we have much guidance from the United States Supreme Court and several state
supreme courts describing the nature of the privilege and the parameters of its application. The
starting point for any discussion of this privilege is Barr v. Matteo, 360 U.S. 564 (1959), the
leading case in this area.



 In Barr, the acting director of the Office of Rent Stabilization was sued for
malicious defamation by two employees whose suspension for misconduct he had announced
through a press release. Id. at 567-68. Both the district court and court of appeals rejected Barr's
contention that absolute privilege attached to his actions. The Supreme Court reversed the
judgment of the court of appeals, holding that the issuance of the press release was within the
"outer perimeter" of Barr's duties, thus making the absolute privilege applicable. Id. at 575. 
Justice Harlan, writing for the plurality, explained the necessity of the privilege:


 The reasons for the recognition of the privilege have been often stated. It
has been thought important that officials of government should be free to exercise
their duties unembarrassed by the fear of damage suits in respect of acts done in
the course of those duties--suits which would consume time and energies which
would otherwise be devoted to governmental service and the threat of which might
appreciably inhibit the fearless, vigorous, and effective administration of policies
of government.



Id. at 571 (Harlan, J., plurality opinion). 

 While the Court was divided and even the plurality (5) characterized the question as
a "close one," the closeness of the issue was due primarily to Barr's position, not the existence
of the privilege. As acting director of the Office of Rent Stabilization, Barr did not hold a
position of cabinet rank or its equivalent. Three of the four dissenters approved application of an
absolute privilege to officials of cabinet level and above. See id. at 583 (Warren, C.J., dissenting)
(Douglas, J., joining); id. at 592 (Stewart, J., dissenting). Only Justice Brennan opposed the
application of an absolute privilege to executive officials regardless of rank. See id. at 586-88
(Brennan, J., dissenting) (contending that only a qualified privilege was appropriate).

 Since Barr, this absolute privilege for executive officers from defamation claims
has been embodied in section 591 of the Restatement (Second) of Torts. This section states that
"[a]n absolute privilege to publish defamatory matter concerning another in communications made
in the performance of his official duties exists for . . . a governor or other superior executive
officer of a state." Restatement (Second) of Torts § 591(b) (1977). The comments to the
Restatement contain the rationale for the privilege: "The public welfare is so far dependent upon
a reasonable latitude of discretion in the exercise of functions of high executive offices that their
incumbents may not be hindered by the possibility of a civil action for defamation in connection
therewith." Restatement (Second) of Torts § 591 cmt. a (1977).

 All of the state courts that have addressed the issue have agreed that an absolute
privilege as described in Barr and section 591 applies to state attorneys general. See, e.g.,
Kilgore v. Younger, 640 P.2d 793, 797-98 (Cal. 1982); Little v. Spaeth, 394 N.W.2d 700, 706
(N.D. 1986); Matson v. Margiotti, 88 A.2d 892, 896 (Pa. 1952); Levinsky v. Diamond, 559 A.2d
1073, 1078 (Vt. 1989); Gold Seal Chinchillas, Inc. v. State, 420 P.2d 698, 701 (Wash. 1966);
Morton v. Hartigan, 495 N.E.2d 1159, 1164-65 (Ill. App. Ct. 1986) (noting that the Illinois
Supreme Court adopted the Barr rationale for the governor in Blair v. Walker, 349 N.E.2d 385
(Ill. 1976), and extending it to cover the attorney general); see also Restatement (Second) of Torts
§ 591 cmt. c (1977). But cf. Chamberlain v. Mathis, 729 P.2d 905, 912 (Ariz. 1986) (rejecting
Barr immunity for Director of Arizona Department of Health Services).

 Although the Texas Supreme Court has not specifically addressed the issue of
absolute privilege for state officials from defamation suits, it has recently adopted the Barr
rationale as the foundation for official immunity in this state. See Kassen v. Hatley, 887 S.W.2d
4, 8 (Tex. 1994). Our courts of appeals have also cited the Barr rationale approvingly. See, e.g.,
Armendarez v. Tarrant County Hosp. Dist., 781 S.W.2d 301, 305 (Tex. App.Fort Worth 1989,
writ denied); Town of South Padre Island v. Jacobs, 736 S.W.2d 134, 143 (Tex. App.Corpus
Christi 1987, writ denied); cf. Martinez v. Hardy, 864 S.W.2d 767, 772-73 (Tex. App.Houston
[14th Dist.] 1993, no writ).

 We are persuaded by the foregoing authorities that the Texas Attorney General has
an absolute privilege to publish defamatory statements in communications made in the
performance of his official duties. Having reached this conclusion, we must now consider if
Morales's actions, as described by Salazar's petition, come within the scope of this absolute
privilege. Again, we benefit from the experience of both the United States Supreme Court and
several state supreme courts.

 Salazar alleged that Morales made the defamatory comments in direct response to
a reporter's question about recent terminations in the Attorney General's office. Salazar contends
that when Morales made these statements he was not acting in his official capacity, but was
responding to personal attacks affecting his ability to be re-elected. (6) We disagree.

 The overwhelming weight of authority reflects that comments made to the press by
a high-ranking official concerning personnel matters are within the scope of the privilege. Again
Barr is instructive. Barr made his defamatory comments about the suspension of two employees
in his agency through a press release. The Supreme Court held that this action was within the
"outer perimeter" of the official's duty. (7) Barr, 360 U.S. at 575. Similarly, the vast majority of
state supreme courts that have considered the question have held that statements to the press
concerning personnel matters are within the official duties of high-ranking state officials. See,
e.g., Johnson v. Dirkswager, 315 N.W.2d 215, 221 (Minn. 1982) (telephone interview with
reporter by Commissioner of Public Welfare concerning termination of employee was within
Commissioner's official duties); Little, 394 N.W.2d at 706 (North Dakota Attorney General's
statement in a newspaper interview about termination of assistant attorneys general was within
discharge of his official duties); Matson, 88 A.2d at 900 (Pennsylvania Attorney General was
acting within official duties in delivering to press a copy of letter alleging attorney 



was a Communist); Hackworth v. Larson, 165 N.W.2d 705, 709 (S.D. 1969) (news release by
Secretary of State concerning termination of employees was within line of duty).

 Only the Arizona Supreme Court has rejected the privilege under these
circumstances. See Chamberlain, 729 P.2d 905. Chamberlain involved comments to a reporter
by the Director of the Arizona Department of Health Services concerning the incompetence of
certain employees. Id. at 907. The court held the official was only entitled to qualified immunity. 
However, in reaching its decision the court specifically noted that it had "not expressly adopted
Barr or its rationale." Id. at 911. The court then rejected Barr in reaching its holding that "in
the vast majority of cases, qualified immunity will adequately protect state executive officials." 
Id. at 912. Unlike the Arizona court, our supreme court has embraced Barr, thereby aligning
itself with the majority position expressed in the Restatement that an absolute privilege exists for
high-ranking state officials such as the attorney general. Consequently, we decline to adopt the
holding in Chamberlain.

 Similarly, the rest of the state authorities on which Salazar relies are readily
distinguishable. The cases Salazar cites rejecting absolute immunity do so in the context of lower-level officials. See Carradine v. State, 511 N.W.2d 733, 735-36 (Minn. 1994) (rejecting absolute
privilege from defamation suit for comments made to press by state trooper); Eubanks v. Smith,
354 S.E.2d 898, 902 (S.C. 1987) (rejecting absolute immunity for city manager's press releases
implying employees were guilty of criminal conduct); Doran v. Cohalan, 509 N.Y.S.2d 51, 52
(N.Y. App. Div. 1986) (rejecting absolute immunity for two county officials).

 Likewise, Salazar's reliance on post-Barr Supreme Court authority is unpersuasive. 
Salazar argues that a trilogy of cases has eroded the scope of Barr. See Butz v. Economou, 438
U.S. 478 (1978); Forrester v. White, 484 U.S. 219 (1988); Buckley v. Fitzsimmons, 113 S. Ct.
2606 (1993). While the Court has limited the concept of official immunity, it has done so solely
in the context of immunity for federal civil rights violations, not state common-law defamation
claims. See Butz, 438 U.S. at 507 (holding only qualified immunity exists in suits for damages
from an unconstitutional action); Forrester, 484 U.S. at 220-21 (denying absolute immunity for
a state-court judge from a section 1983 claim); Buckley, 113 S. Ct. at 2617 (rejecting absolute
immunity for state prosecutors from section 1983 claim). What the Court has prescribed is one
level of analysis for immunity from common-law defamation claims and another for constitutional
claims. These cases do not overrule Barr as applied to a state common-law defamation claim. 
See Butz, 438 U.S. at 507 (holding qualified immunity for constitutional violations is consistent
with Barr). In the present case, the trial court recognized the different analysis required for a
section 1983 claim when it severed Salazar's federal civil rights claim from his state-law
defamation claim.

 Salazar raises two final challenges to the immunity doctrine. Initially, Salazar
argues that the statement must be "made in conjunction with or contemporaneously with the
firing" to come within the privilege. Not only is there no authority for this position, but Salazar
offers no rationale for such a restriction. Furthermore, despite the fact that Salazar had been
terminated two months earlier, Morales's statements were made within one day of the initial
newspaper article focusing on Salazar's termination. We conclude that Salazar's
"contemporaneousness" argument is without merit.

 Finally, Salazar contends that Morales is not entitled to immunity because his
statements were made in his capacity as a politician seeking re-election, not as Attorney General. 
The California Supreme Court was confronted with this identical contention in Kilgore v.
Younger. Kilgore sued the California Attorney General for defamation because of press releases
tying him to organized criminal activity. Kilgore, 640 P.2d at 795-96. Kilgore alleged in his
petition that when Younger released the information he was acting as a candidate and, therefore,
was not performing an official duty. Id. at 798. The California Supreme Court had little
difficulty in rejecting this contention: "The latter argument is without merit: Younger's alleged
activity, though it may well have been taken to produce a popular and appealing law enforcement
image, was for all intents and purposes indistinguishable from actions initiated by public officials
truly oblivious to the political ramifications of their moves." Id.

 Similarly, we decline to dissect Morales's comments to discern whether they were
politically motivated. It is sufficient to invoke the absolute privilege that the statements concerned
personnel matters in his agency. When the head of a state executive agency offers an explanation
to the press, and hence the public, for the dismissal of employees, he acts within his official
duties. We conclude that Morales was acting within the scope of his official duties when he
responded to a reporter's question regarding Salazar's termination. 


CONCLUSION


 In sum, we hold that the Texas Attorney General has an absolute privilege to
publish, in the performance of his official duties, material that may be perceived to be defamatory. 
Further, we hold that statements made by the Attorney General in response to reporters' inquiries
concerning the termination of employees in his office are within his official duties and, therefore,
within the absolute privilege. We overrule Salazar's single point of error and affirm the trial
court's judgment dismissing Salazar's defamation suit.



 J. Woodfin Jones, Justice

Before Chief Justice Carroll, Justices Aboussie and Jones

Affirmed

Filed: June 21, 1995

Publish
1. Specifically, the investigation discovered that the companies were charging the same
or higher premiums for insuring property that was depreciating in value. As a result, the
companies' risk of loss declined, but there was no comparable decline in consumer
premiums.
2.   The record does not reflect the location where Morales was questioned by the
Associated Press reporter. Salazar's pleadings are silent on this matter. The newspaper
articles attached to the pleadings also omit the specific location. At oral argument, the
parties were also unable to specifically identify the forum. Apparently, Morales made a
public appearance in Houston and addressed some gathering. The reporter questioned
him there.
3.   Three of these articles were attached to Salazar's pleadings. See Morales Says Shake-up Is No Cause for Worry, Hous. Chron., Feb. 4, 1994, at 26A; Morales Defends Office
Shakeup Amid Lawsuit, San Antonio Express-News, Feb. 4, 1994, at 12A; Clay Robinson,
Morales Gets Heat For Axing Insurance Suit, Hous. Chron., Feb. 5, 1994, at 27A.
4. This claim is still pending in the district court under a different cause number.
5.   The plurality was composed of Justices Harlan, Frankfurter, Clark, and Whittaker. 
Justice Black concurred in the judgment on First Amendment grounds.
6.   In his brief, Salazar also argues that because he alleged Morales was not acting in
his official capacity, we must accept that statement as true. Salazar is incorrect. In a
jurisdictional challenge we accept Salazar's factual allegations as true. See Alford v. City of
Dallas, 738 S.W.2d 312, 314 (Tex. App.Dallas 1987, no writ). We are not required to
accept the blanket legal conclusion that Morales was not acting in his official capacity. That
question of law is for this Court to determine, based on the underlying facts alleged by
Salazar.
7.   Significantly, the "outer perimeter" language must be read in the context of Barr's
official status. Barr was merely the acting director of the Office of Rent Stabilization--a
position neither appointed by nor directly responsible to the President. Barr, 360 U.S. at
583. The Court recognized that "the occasions upon which the acts of the head of an
executive department will be protected by the privilege are doubtless far broader than in the
case of an officer with less sweeping functions." Id. at 573. The Court concluded that "the
higher the post, the broader the range of responsibilities and duties, and the wider the scope of
discretion." Id. Given this language, we think it doubtful that the Court would have
described the press release as being in the "outer perimeter" of official duty if the actor had
been the head of an executive agency, such as the Attorney General.