# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### October 2, 2013 Session

## ZOYLE JONES v. STATE OF TENNESSEE

**Appeal by Permission from the Court of Appeals, Middle Section**
**Tennessee Claims Commission**
**No. T20100218     Robert Hibbett, Commissioner**

---

**No. M2012-02546-SC-S09-CV - Filed December 23, 2013**

---

The issue presented in this case is one of first impression: whether cabinet-level state executive officials are absolutely immune from defamation claims arising out of statements made while performing their official duties. An employee of the Tennessee Department of Correction ("TDOC") was disciplined for double-billing claims for his job-related travel expenses to both the state and a private organization. After the TDOC Commissioner responded to media inquiries about the employee's demotion for violating the state's travel billing policy, the employee sued the State of Tennessee and the TDOC for defamation. The State moved for summary judgment, asserting that the TDOC Commissioner had an absolute privilege to make the allegedly defamatory statements to the media. The Tennessee Claims Commission denied the State's motion. Upon review, we hold that the State is absolutely immune from the employee's defamation claims that relate to the TDOC Commissioner's statements in response to media inquiries about the employee's demotion. This ruling allows cabinet-level officials to perform their governmental duties free from legal harassment and uninhibited by the fear of potential lawsuits arising out of their job-related speech. It also furthers the vital free-expression principle that the public has a right to receive critical information from the government and its public officials, who must be free to speak with complete candor about matters of public importance. The judgment of the Claims Commission is reversed.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Claims Commission Reversed; Case Remanded**

SHARON G. LEE, J., delivered the opinion of the Court, in which GARY R. WADE, C.J., and JANICE M. HOLDER, CORNELIA A. CLARK, and WILLIAM C. KOCH, JR., JJ., joined.

Pamela S. Lorch, Nashville, Tennessee, for the appellant, State of Tennessee.

Jeffery Scott Frensley, Nashville, Tennessee, for the appellee, Zoyle Jones.

**OPINION**

**FACTUAL BACKGROUND**

Zoyle Jones worked for the TDOC for twenty-seven years, beginning in 1985. From April 2003 through February 2009, he served as the TDOC's Director of Classification Programs. Among other things, Mr. Jones's duties required him to visit different penal institutions across the state.

While he was employed by the TDOC, Mr. Jones also served as the President of the Tennessee State Employees Association ("TSEA"), which is a private entity. Occasionally, Mr. Jones would travel both in his capacity as a Director of the TDOC and as the President of the TSEA. On many occasions, Mr. Jones claimed and received travel reimbursement from both the State of Tennessee and the TSEA for the same trips.

In late 2008, the TDOC's Office of Internal Affairs began investigating Mr. Jones's travel claims and reimbursements. By letter dated February 9, 2009, Mr. Jones was advised by TDOC Commissioner George Little that he was being investigated for falsifying travel reimbursement claims and for double-billing the TDOC and the TSEA for the same travel. The results of the investigation confirmed that on twelve occasions between June 2004 and August 2008, Mr. Jones had submitted travel claims to both entities. In the TDOC's view, these actions constituted theft, official misconduct, and a violation of the False Claims Act.[1] Mr. Jones was further advised that a hearing would be conducted on February 11, 2009, to determine the appropriate discipline.

At the February 11, 2009 hearing, Mr. Jones admitted that he had been reimbursed by both the TDOC and the TSEA for the same travel. On February 17, 2009, Commissioner Little sent Mr. Jones a letter informing him that "[i]t is a serious violation of State travel regulations to be reimbursed by the State and another entity for the same travel (in this case mileage). Moreover, the nature of these violations may rise to the level of a criminal matter." The letter also informed Mr. Jones that he had been demoted to the lower-paying position of Correctional Counselor II and reassigned to the Tennessee Prison for Women.

Media outlets contacted Commissioner Little about Mr. Jones's alleged double-billingIn response to these media inquiries, the TDOC formally released the letters that Commissioner Little had previously sent to Mr. Jones on February 9th and 17th, both of which were public records within the meaning of Tenn. Code Ann. § 10-7-503

---

[1] The "False Claims Act" is codified at Tenn. Code Ann. § 4-18-101 to -108 (2011 & Supp. 2013).

(2012).[2] Commissioner Little also spoke to different members of the media concerning Mr. Jones's demotion. One media outlet quoted Commissioner Little as saying: "At issue was the claim for full reimbursement over a period of several years that certainly was in violation of state travel regulations." The substance of Commissioner Little's statements to the media was directly related to the content of the February 9th and February 17th letters that he had sent to Mr. Jones.

Rather than accept a demotion, Mr. Jones retired. On August 10, 2009, Mr. Jones filed a claim against both the State of Tennessee and the TDOC with the Tennessee Claims Commission seeking damages for defamation, false light invasion of privacy, and the disclosure of confidential information to the TSEA pursuant to Tenn. Code Ann. § 9-8-307(a)(1)(N) (2012) and § 10-7-504(a)(8) (2012 & Supp. 2013). In its answer to Mr. Jones's complaint, the State asserted numerous affirmative defenses, including that the statements published by Commissioner Little were absolutely privileged. The State also filed a motion for summary judgment, seeking dismissal of the defamation claim on the bases that: Commissioner Little's statements were absolutely privileged; the Claims Commission lacked jurisdiction over the false light invasion of privacy claim[3]; and Tenn. Code Ann. § 10-7-504 does not provide a private cause of action.

The Claims Commission denied the State's motion for summary judgment on Mr. Jones's defamation claim. In denying the State's motion, the Claims Commission held that it had no authority to determine whether absolute immunity applied to Commissioner Little and found that there was a dispute of material fact regarding whether Commissioner Little acted with actual malice[4] in speaking to the press about his February 9 and February 17, 2009 letters. With respect to Mr. Jones's false light and statutory claims, however, the Claims

---

[2] Tenn. Code Ann. § 10-7-503(a)(2)(A) provides:

(a)(2) All state . . . records . . . shall, at all times, during business hours . . . be open for personal inspection by any citizen of this state, and those in charge of the records shall not refuse such right of inspection to any citizen, unless otherwise provided by law."

[3] Some jurisdictions do not recognize the false light invasion of privacy tort, considering it to be duplicative of a defamation claim. *See Denver Publ'g Co. v. Bueno*, 54 P.3d 893 (Col. 2002); *Cain v. Hearst Corp.*, 878 S.W.2d 577 (Tex. 1994); *Renwick v. News & Observer Publ'g Co.*, 312 S.E.2d 405 (N.C. 1984). This Court has recognized false light as a separate and distinct tort. *See West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640 (Tenn. 2001).

[4] Actual malice is the constitutional standard established by the U.S. Supreme Court in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). The Supreme Court defined actual malice as publishing material "with knowledge that it was false or with reckless disregard of whether it was false or not." *Id*. at 279-80. The Court also held that public officials who sue for defamation must show evidence of actual malice by clear and convincing evidence. *Id*. at 285-86.

Commission granted the State's motion for summary judgment, reasoning that it lacked jurisdiction to hear false light claims and that Tenn. Code Ann. § 10-7-504(a)(8) does not establish a private cause of action.

The Claims Commission granted the State's motion for interlocutory appeal, but the Court of Appeals denied the motion. The State filed a Tenn. R. App. P. 11 application for permission to appeal to this Court, which we granted.

## ANALYSIS

This interlocutory appeal raises an important issue of first impression: whether cabinet-level state executive officials are absolutely immune from defamation claims arising out of statements made while performing their official duties.[5] Defamation lawsuits serve a vital function by allowing aggrieved individuals to seek redress from false statements of fact that impugn their reputations. In the 1966 case *Rosenblatt v. Baer*, former U.S. Supreme Court Justice Potter Stewart eloquently expressed the societal importance of protecting individuals from reputational harm, noting that: "The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being — a concept at the root of any decent system of ordered liberty." 383 U.S. 75, 92 (1966) (Stewart, J., concurring).

Despite the importance of protecting individuals from reputational harm, Tennessee law recognizes both absolute and qualified privileges as defenses to defamation claims in certain instances. *Simpson Strong-Tie Co., Inc. v. Stewart, Estes & Donnell*, 232 S.W.3d 18, 22 (Tenn. 2007). "An absolute privilege is a total immunity granted on the basis of the speaker's position or status." *See* Robert D. Sack, *Sack on Defamation: Libel, Slander and Related Problems* § 8.1 (4th ed. 2012). Absolute privileges shield a defendant from liability for defamatory statements even when made with ill will, malice or some other improper purpose. *Id*. at §8.2. Qualified privileges, on the other hand, shield defendants from liability for most defamatory statements, but can be overcome by a plaintiff's showing that the statements were made with actual malice or ill will. *Id*. at §9.1. In this case, the State argues that this Court should adopt an absolute privilege for defamation claims against state executive officials. In contrast, Mr. Jones contends that this Court should adopt only a qualified privilege.

In *Barr v. Matteo*, 360 U.S. 564 (1959), the U.S. Supreme Court adopted an absolute privilege for federal executive officials who publish defamatory statements in the performance

---

[5] Although this opinion addresses the applicability of an absolute privilege for cabinet-level state executive officials to make defamatory statements, there has been no judicial finding that the statements made by Commissioner Little were in fact defamatory.

of their official duties. In a plurality opinion, Justice John Marshall Harlan expressed the following rationale:

> It has been thought important that officials of government should be free to exercise their duties unembarrassed by the fear of damage suits in respect of acts done in the course of those duties—suits which would consume time and energies which would otherwise be devoted to governmental service and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration of policies of government.

*Id.* at 571. Justice Harlan further explained that the invocation of the absolute privilege represented "an expression of a policy designed to aid in the effective functioning of government." *Id*. at 572-73.

In *Barr*, the Court held that absolute privilege applied to the acting director of a federal agency who had issued a press release about former employees of the agency. The former employees contended that the director's press release contained defamatory statements. However, the Supreme Court ruled that the director was protected by absolute privilege when he issued the press release and dismissed the employees' claims, reasoning that communicating with the media by disseminating the press release "was an appropriate exercise of the discretion which an officer of that rank must possess if the public service is to function effectively." *Id*. at 575. The *Barr* Court acknowledged that conferring an absolute privilege may lead to "occasional instances of actual injustice," but reasoned that such a price is "a necessary one to pay for the greater good." *Id*. at 576. Previously, in *Gregoire v. Biddle*, Judge Learned Hand offered a similar rationale for adopting absolute immunity for government officials in the context of an allegedly unlawful arrest, explaining that:

> The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties.

177 F.2d 579, 581 (2d Cir. 1949).

Immunizing government officials against harassment and giving them the ability to perform their jobs "in the unflinching discharge of their duties," however, is not the only rationale that supports adopting an absolute privilege against defamation for cabinet-level state executive officials. *Id.* In his separate concurring opinion in *Barr*, Justice Hugo Black explained that adopting an absolute privilege advanced significant First Amendment free speech interests. "The effective functioning of a free government like ours depends largely

-5-

on the force of an informed public opinion," Justice Black explained. *Barr*, 360 U.S. at 577 (Black, J., concurring). "This calls for the widest possible understanding of the quality of government service rendered by all elective or appointed public officials or employees." *Id.* We agree that the public has a vital interest in receiving information from public officials about the effective, or ineffective, functioning and performance of the government.

Consistent with the Supreme Court's holding in *Barr*, the Restatement (Second) of Torts provides for an absolute privilege against defamation claims for high-ranking federal and state executive officials. *See* Restatement (Second) of Torts § 591 (1977) ("An absolute privilege to publish defamatory matter concerning another in communications made in the performance of his official duties exists for (a) any executive or administrative officer of the United States; or (b) a governor or other superior executive officer of a state."). Comment *c* to Section 591 further explains that "the absolute privilege stated in Clause (b) protects the superior officers of the state governments, including at least the governor, the attorney-general or the heads of state departments whose rank is the equivalent of cabinet rank in the Federal Government." *Id*. cmt. *c*.

"Like their federal counterparts, high-ranking elected state officials and other officials of cabinet level or equivalent rank are generally held entitled to an absolute privilege as to their defamatory communications while exercising discretionary functions." David Elder, *Defamation: A Lawyer's Guide* § 2:14 (2003). Many states have adopted the Restatement (Second) of Torts' absolute privilege against defamation claims for certain executive officials. In *Johnson v. Dirkswager*, for example, the Minnesota Supreme Court held that a state-level commissioner who allegedly uttered defamatory comments to the public about an employee through a press release was entitled to an absolute privilege. 315 N.W.2d 215 (Minn. 1982). Weighing the "public's right to know [against] a defamed individual's right to redress," the Minnesota Supreme Court ultimately concluded that "the balance is to be struck in favor of the public's right to know" because the state employee's interest must "yield[] to the needs of a free, democratic society to be apprised of the conduct of the public business by its public officials." *Id*. at 221, 23. In *Hackworth v. Larson*, the Supreme Court of South Dakota had reached an identical holding in a case involving the South Dakota Secretary of State, who had issued press releases stating that she had fired two employees. 165 N.W.2d 705 (S.D. 1969). As the *Hackworth* court explained: "It is thought desirable to encourage free and uninhibited dissemination of information about governmental activities even if on occasions an individual suffers harm thereby." *Id*. at 709.

More recently, in *Salazar v. Morales,* the Texas Court of Appeals adopted the absolute privilege reflected by the Restatement (Second) of Torts as applied to the Texas Attorney General. 900 S.W.2d 929 (Tex. App. 1995). *Salazar* involved a defamation claim asserted against the Texas Attorney General regarding comments that he had made to the press about

a former employee's termination. In affirming the Texas Attorney General's motion to dismiss, the Texas Court of Appeals determined that the Texas Attorney General "ha[d] an absolute privilege to publish defamatory statements in communications made in the performance of his official duties." *Id*. at 932. The *Salazar* court also observed that: "All of the state courts that have addressed the issue have agreed that an absolute privilege . . . applies to state attorneys general." *Id.*, citing *Kilgore v. Younger*, 640 P.2d 793, 797–98 (Cal. 1982); *Little v. Spaeth*, 394 N.W.2d 700, 706 (N.D.1986); *Matson v. Margiotti*, 88 A.2d 892, 896 (Pa. 1952); *Levinsky v. Diamond*, 559 A.2d 1073, 1078 (Vt. 1989); *Gold Seal Chinchillas, Inc. v. State*, 420 P.2d 698, 701 (Wash. 1966); *Morton v. Hartigan*, 495 N.E.2d 1159, 1164–65 (Ill. App. Ct. 1986).

While the common law doctrine of absolute immunity remains the majority rule, we note that other states afford executive officials only a qualified privilege for statements made in the course of their official duties. *See Sack*, § 8.2.5 ("A few states deny absolute immunity to public officials altogether and grant a qualified privilege for statements made in the course of official duties."). The Hawaii Supreme Court, for example, has rejected the application of an absolute privilege to state officials, instead holding that such officials are entitled to a qualified privilege. *Towse v. Hawaii*, 647 P.2d 696, 701-02 (Haw. 1982). Similarly, in *Chamberlain v. Mathis,* the Arizona Supreme Court adopted a qualified privilege for the Director of the Arizona Department of Health Services, reasoning in that case that the rationale supporting absolute immunity is "countered by basic principles of equal justice." 729 P.2d 905, 912 (Ariz. 1986).

We note that "the overwhelming majority of cases have struck the balance in favor of encouraging public officials to speak with complete candor – and without fear of legal recourse – with respect to their official duties." *Gold Seal*, 420 P.2d at 701. Pennsylvania, for example, reaffirmed the common law's absolute privilege against defamation for all "high public officials." *See Lindner v. Mollan*, 677 A.2d 1194, 1196 (Pa. 1996) ("This Court has never called into question, much less overruled, the common law doctrine of absolute privilege for high public officials."). We agree with this longstanding majority rule. Accordingly, we adopt the position taken by the Restatement (Second) of Torts that cabinet-level executive officers are entitled to an absolute privilege from defamation claims arising out of comments made within the scope of their official duties. Restatement (Second) of Torts § 591.

In Tennessee, commissioners serve as the heads of state departments and function as part of the "Governor's Cabinet."[6] These officials formulate official policy and exercise

---

[6] *See* Governor's Cabinet Members, http://www.tn.gov/governor/cabinet/, (last visited Nov. 22, 2013).

significant supervisory authority in conducting state business.[7] Such officials must have the flexibility to make important decisions free from fear that they will have to defend themselves from lawsuits. *Gregoire*, 177 F.2d at 581. Uninhibited communication with the public about governmental affairs is essential and must be protected. *Barr*, 360 U.S. at 577 (Black, J., concurring). Because providing cabinet-level executive officials with anything less than absolute immunity from defamation claims would also force such officials to spend time responding to lawsuits rather than discharging their public duties, *see Gregoire*, 177 F.2d at 581, we hold that providing absolute immunity to such officials is appropriate.

We recognize that in some cases, the application of an absolute privilege to cabinet-level state officials may leave aggrieved individuals without a remedy. Nonetheless, such a sacrifice "is justified by the public's need for free and unfettered action by its representatives." *Blair v. Walker*, 349 N.E.2d 385, 389 (Ill. 1976). As other courts have observed, an individual's right to redress must ultimately be balanced against the public interest, and that balance must be struck in favor of the "needs of a free, democratic society to be apprised of the conduct of the public business by its public officials." *Johnson*, 315 N.W.2d at 223.

Adopting an absolute privilege for cabinet-level state executive officials provides them with the same level of protection afforded their colleagues in the judicial and legislative branches. "The immunity of judges can be traced as far back as the time of [Sir Edward] Coke,"[8] *see* Sack, § 8.2.1. Statements made in judicial proceedings are absolutely privileged. *Lea v. White*, 36 Tenn. (4 Sneed) 111 (1856). The need for judicial immunity "is based upon the consideration that the judge represents the public." *Webb v. Fisher*, 72 S.W. 110, 112 (Tenn. 1903). "It is generally recognized that statements made in the course of a judicial proceeding that are relevant and pertinent to the issues involved are absolutely privileged and cannot be the predicate for liability in an action for libel, slander, or invasion of privacy." *Lambdin Funeral Serv., Inc. v. Griffith*, 559 S.W.2d 791, 792 (Tenn. 1978). Legislators also have an absolute privilege. *See* Tenn. Const. art. II, § 13 ("Senators and representatives shall . . . be privileged from arrest during the session of the General Assembly, and in going to and returning from the same; and for any speech or debate in either House, they shall not be questioned in any other place.").

Mr. Jones correctly notes that the U.S. Supreme Court's ruling on absolute privilege in *Barr*, 360 U.S. 564, preceded the Supreme Court's seminal libel law decision in *New York*

---

[7] This case concerns statements made by TDOC Commissioner Little, who is a cabinet-level official. We do not decide in this case whether the privilege of absolute immunity extends beyond cabinet-level officials.

[8] Sir Edward Coke (1552-1634) was an influential English jurist.

*Times Co. v. Sullivan*, 376 U.S. 254, and he argues that the constitutional protections afforded by *Sullivan* adequately protect governmental defendants from defamation claims.[9] In that landmark decision, the U.S. Supreme Court determined that public officials who sue for libel must prove by clear and convincing evidence that a defendant acted with actual malice. Upon review, we find Mr. Jones's arguments unpersuasive.

While the actual malice standard set forth in *Sullivan* presents a significant hurdle for Mr. Jones and other public figure plaintiffs[10] to clear in defamation lawsuits, it provides governmental defendants with less protection than an absolute privilege.[11] Notably, some legal commentators have also suggested that the actual malice standard of *Sullivan* does not sufficiently protect free speech. *See, e.g.*, Anthony Lewis, *New York Times v. Sullivan Reconsidered: Time to Return to the 'Central Meaning of the First Amendment*,' 83 Colum. L. Rev. 603, 624-25 (1983); David A. Anderson, *Libel and Press Self-Censorship*, 53 Tex. L. Rev. 422, 424-25, 479-80 (1975). Moreover, providing cabinet-level executive officials with anything less than absolute immunity from defamation claims would result in the unacceptable consequence of forcing such officials to waste precious time responding to lawsuits rather than discharging their public duties. *Gregoire*, 177 F.2d at 581. Accordingly, we agree with the State that *Sullivan*'s actual malice standard is insufficient to protect cabinet-level executive officials from claims of defamation. Thus, we adopt the view held by the vast majority of states that the better course of action is to afford such high-ranking executives absolute immunity from defamation claims.

Cabinet-level executive officials are absolutely immune from defamation claims, but this holding does not automatically apply to all statements made by such officials. Crucially, the absolute privilege for these officials applies only to communications made pursuant to a cabinet-level officer's official duties. Restatement (Second) of Torts § 591 (1977). Comment *f* to Section 591 specifically explains that the absolute privilege applies only when the state official "publishes the defamatory matter in the performance of his

---

[9] Justice William Brennan authored the Court's decision in *Sullivan* and dissented in *Barr*.

[10] Mr. Jones acknowledged in his deposition that, as president of the TSEA, he qualified as a public figure.

[11] In *Sullivan*, Justice Black and Justice Arthur Goldberg each wrote separate concurring opinions, contending that the Court should have adopted an absolute privilege for critical comments made by public officials rather than the actual malice rule. Justice Black explained: "The requirement that malice be proved provides at best an evanescent protection for the right critically to discuss public affairs and certainly does not measure up to the sturdy safeguard embodied in the First Amendment." 376 U.S. at 293 (Black, J., concurring). For his part, Justice Goldberg opined: "In my view, the First and Fourteenth Amendments to the Constitution afford to the citizen and to the press an absolute, unconditional privilege to criticize official conduct despite the harm which may flow from excesses and abuses." 376 U.S. at 298 (Goldberg, J., concurring).

official duties, or within the scope of his line of duty." *Id.* We agree that this limitation is an appropriate one.

As applied to Mr. Jones's defamation claim, we hold that Commissioner Little was acting within the scope of his official duties when he issued the February 9 and February 17, 2009 letters and subsequently responded to media inquiries about Mr. Jones's demotion. "The overwhelming weight of authority reflects that comments made to the press by a high-ranking official concerning personnel matters are within the scope of the [executive] privilege." *Salazar*, 900 S.W.2d at 932-33. Because Commissioner Little's letters and subsequent statements to the media concerned state personnel matters, these publications were made in the performance of his official duties as a cabinet-level executive official. Thus, the State is absolutely immune from Mr. Jones's claim of defamation.

Mr. Jones also urges us to recognize a distinction between Commissioner Little's letters and the Commissioner's subsequent statements to the media about their contents. There is no material difference between Commissioner Little's February 9 and February 17, 2009 letters and Commissioner Little's statements to the media about the letters' contents. The letters were matters of public record; therefore, the letters' contents were public. *See Johnson*, 315 N.W.2d at 222. Accordingly, we hold that the State is absolutely immune from Mr. Jones's defamation claims that relate to Commissioner Little's statements in response to media inquiries about Mr. Jones's demotion.

### Conclusion

We hold that cabinet-level executive officials "have an absolute privilege to publish defamatory matter concerning another in communications made in the performance of his official duties." This privilege ensures that high-ranking state executive officials will enjoy "complete freedom of speech when discharging their duties." Sack, § 8.2. Commissioner Little, as a cabinet-level executive official with policy-making authority, is entitled to this absolute privilege. Because Commissioner Little's statements to the press concerning Mr. Jones were directly related to his official duties, Commissioner Little is entitled to absolute immunity from Mr. Jones's defamation claim, and the State is therefore immune from liability. Accordingly, we reverse the decision of the Tennessee Claims Commission and remand the case to the Claims Commission for any further proceedings.

The costs of this appeal are taxed to Zoyle Jones, for which execution may issue if necessary.

_____
SHARON G. LEE, JUSTICE

-10-