# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
February 6, 2024 Session

## RICHARD BROCK HILL v. STATE OF TENNESSEE

**Appeal from the Tennessee Claims Commission**
**No. T20202222-1    James A. Haltom, Commissioner**

———————————————————

### No. M2022-01749-COA-R3-CV

———————————————————

Richard Brock Hill, a former Deputy Commissioner of the Tennessee Department of Environment and Conservation (TDEC), brought an action for defamation against the State regarding statements made in connection with a sexual harassment investigation that resulted in the termination of his employment. The Claims Commission dismissed the complaint for failure to state a claim. In reaching this conclusion, the Claims Commission analyzed the potentially defamatory statements and concluded that each statement was time-barred and/or failed as to an essential element of a defamation claim. Regarding statements contained in an "Investigation Summary Memorandum," the Claims Commission also concluded that Mr. Hill's defamation claim failed because the document was prepared by a Deputy Commissioner and was, accordingly, protected by absolute executive privilege. We conclude that Mr. Hill adequately alleged defamation such that dismissal of his claim was error and that the existent record and filings do not support a conclusion that, as a matter of law, absolute executive privilege protects the statements contained in the Investigation Summary Memorandum. We reverse and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Claims Commission Reversed; Case Remanded**

JEFFREY USMAN, J., delivered the opinion of the court, in which in which FRANK G. CLEMENT, JR., P.J., M.S., and W. NEAL MCBRAYER, J., joined.

W. Gary Blackburn and Bryant Kroll, Nashville, Tennessee, for the appellant, Richard Brock Hill.

Jonathan Skrmetti, Attorney General and Reporter; J. Matthew Rice, Solicitor General; and Heather C. Ross, Senior Assistant Attorney General, for the appellee, the State of Tennessee.

**OPINION**

**I.**

Richard Brock Hill, who previously served as a Deputy Commissioner of the Tennessee Department of Environment and Conservation (TDEC), asserts that the State of Tennessee, via multiple state employees, fabricated sexual harassment complaints against him, conducted a sham investigation into accusations known to be false, and disseminated false statements about him via the media to the public by alleging improper misconduct to justify his termination.[1] He contends that the allegedly false allegations stemmed not from any actual wrongdoing on his part, which he denies, but instead from personal grievances. Mr. Hill also asserts that those who knew the allegations to be false, nevertheless, disseminated false allegations to and through the media and used a sham investigation as a cover.

Turning to the underlying circumstances giving rise to this suit, Mr. Hill was the Deputy Commissioner of TDEC from March 2011 until February 9, 2019. According to his Complaint, the allegations of sexual harassment against him originally stemmed from a conversation Mr. Hill had on February 6, 2019, with L.B., a state employee who worked at Henry Horton State Park. Mr. Hill alleges that the two discussed a shared intertest in hiking and that Mr. Hill "double dog dared" L.B. to attempt a hike on Angel's Landing, a particularly challenging and "scary" hike with huge drops along a narrow trail in Zion National Park in Utah. Mr. Hill alleges that subsequently, L.B. "told a joke to Ryan Jenkins [Manager] at Henry Horton [State Park] that Mr. Hill had a 'crush' on her because he made an effort to speak with her when he visited the location." Mr. Hill avers that L.B.'s statement was clearly a joke and that L.B. did not assert that Mr. Hill was sexually harassing her. Mr. Hill attached to his Complaint text messages between L.B. and him stretching back to 2017. The messages are not extensive and touch on work, Bonnaroo, and karaoke. In the final messages, Mr. Hill sends a YouTube video of the Angel's Landing hike, the daunting hike the two had discussed, with the message "Are you ready?" and L.B. responds, "Heck yeah!" Mr. Hill indicated that he sent L.B. this video link of the Angel's Landing hike the day after they had discussed this particular hike as part of their mutual interest in hiking.

Mr. Hill contends that state employees converted what they knew to be an innocent exchange that he had with L.B. into an allegation of sexual harassment, while knowing that no actual harassment had occurred and that none had been claimed by L.B. Mr. Hill asserts that after L.B. jokingly made the statement about the "crush" to Mr. Jenkins that Mr. Jenkins seized upon the comment and contacted another state employee to further this

---

[1] Mr. Hill does not dispute that he is an employee at will and serves at the pleasure of the Commissioner. *See* Tenn. Code Ann. § 8-30-202(a)(2), (b).

falsehood. The Complaint attaches text messages between Mr. Jenkins and an unidentified state employee. In the messages, Mr. Jenkins asks, "Would you want to know if Brock made an inappropriate comment to [name redacted]?"[2] The unidentified state employee recipient states he or she will be at the park within the hour. The unnamed employee asks when Mr. Jenkins was told of the complaint, and he responds it was the previous night at dinner. Mr. Jenkins tells the unnamed employee that the complainant is aware he "passed it up the chain" and is "good with it" but "is worried about repercussions." Mr. Jenkins then states, "He's already been messaging her today and invited her to go camping with him out west." The state employee asks for copies of the text messages. Mr. Jenkins states, "She has tons of them. She says they are [aw]kward, but she plays along as if he was a friend." The two discuss whether the complainant is "encouraging," and Mr. Jenkins describes her texts as "friendly." He concludes, "In her words, it is 'disgusting' though." Mr. Hill asserts this was knowingly false information from Mr. Jenkins, who allegedly had a personal animus towards Mr. Hill.

According to Mr. Hill's complaint, the state employees were not truly trying to follow up on sexual harassment allegations, and there were no real allegations of harassment; rather, state employees were endeavoring to convert L.B.'s joke into a claim of sexual harassment. Mr. Hill alleges the state employees knew he had not engaged in sexual harassment. He also alleges in his complaint that L.B. informed him that, the morning after their hiking conversation and her joking reference to Mr. Jenkins about the "crush," her phone "lit up" with messages. Sara Sloane, head of TDEC's human resources department, contacted L.B. about an allegation that Mr. Hill sexually harassed her. The Complaint alleges that L.B. was "surprised by the allegations." The Complaint alleges that L.B. informed state employees "that Hill never invited her to go camping" and that he had never sexually harassed her. After a state employee threatened to subpoena her cell phone records, L.B. provided her text messages to the State. Mr. Hill further alleged that Mr. Jenkins threatened L.B. with retaliation for not cooperating with the investigation of Mr. Hill, telling her to "get on the bus or get run over by the bus." Mr. Hill alleges L.B. was ultimately terminated "because of her refusal to remain silent about the false allegations against Mr. Hill."

On February 8, 2019, Mr. Hill was called into a meeting with TDEC officials, including a TDEC attorney and Commissioner David Salyers, and he was informed that he was being terminated for sexual harassment, including inappropriate touching. He alleges he was told allegations of sexual harassment against him had been corroborated but that he was not given any further information regarding the complaint. Mr. Hill alleges also that he had not been interviewed regarding the complaint. In relation to the allegations of sexual harassment, Mr. Hill asserts in his Complaint that the state employees knew these allegations to be false. Presented with a resignation letter, Mr. Hill refused to sign the letter. Instead, the Commissioner signed a letter informing Mr. Hill that his appointment

---

[2] This redaction is in the text messages produced in the record.

was expiring on February 9, 2019. On February 9, Mr. Hill removed his personal property from his office. He alleges that he had a conversation with Ms. Sloane that day, stating to her that certain people had a motive to "do this" to him. In particular, he noted that a new software program designed to prevent theft was unpopular with Henry Horton Park staff.

Mr. Hill alleges that on or about February 12, 2019, state employees "tipped off the media" about Mr. Hill's departure and spread false rumors that he sexually harassed state employees, claiming that an investigation had been conducted although the investigation had only been a sham. Mr. Hill attached to the Complaint a February 9, 2019 text message from Kevin Mahoney to an unidentified recipient declaring, "Just a heads up the Brock stuff is out and spreading like wildfire." Mr. Hill alleges that between February 13 and 26, 2019, the State "continued to publish false statements to the media and other third parties that the purported complaints of sexual harassment had been 'corroborated.'" Mr. Hill cites two brief emails from TDEC employee Eric Ward to reporter Jeremy Finley. In one email, Mr. Ward confirmed that Mr. Hill was separated from service following an investigation into workplace misconduct. In the other email, Mr. Ward stated that no public records specific to the claims or investigation were available. Mr. Hill asserts these statements were false insofar as they stated that "(1) Hill was separated after an investigation of workplace misconduct; and (2) that there was an actual investigation and (3) that the investigation had revealed that Mr. Hill was guilty of misconduct." Mr. Hill asserts these statements were made with knowledge of or reckless disregard as to their falsity. Mr. Hill also asserts that Mr. Ward described the text messages Mr. Hill sent as "disgusting" to the media. Between February 13 and 26, 2019, the media sought but was denied access to public records regarding the allegations of sexual harassment.

According to Mr. Hill's Complaint, the State never interviewed any eyewitnesses regarding the complaints of misconduct. Furthermore, Mr. Hill alleges that the investigation was not completed in the manner required by DOHR policy, which mandates an interview with the alleged offender and witnesses. Mr. Hill further alleges that the State knew Mr. Hill did not engage in misconduct and that the allegations of misconduct were false. According to Mr. Hill, state employees, nevertheless, disseminated false defamatory allegations to the media.

An Investigation Summary Memorandum (the Memo) was prepared on or about February 26, 2019, by Leslie Farmer, Deputy Commissioner and General Counsel of the Department of Human Resources. The Memo states that a female employee in TDEC gave verbal notice on February 6, 2019, of a complaint of inappropriate behavior by Mr. Hill and that the human resources department of TDEC as well as TDEC's Office of General Counsel were notified. The Memo states that during the review of the complaint, TDEC became aware of three additional complaints about Mr. Hill from TDEC staff, and it informed the Department of Human Resources (DOHR) of the "allegations and its findings" on February 8. According to the Memo, DOHR then reviewed TDEC's analysis. The allegations were that the four employees were subjected to "unwelcomed verbal and

physical contact," including "sexually charged comments," "over a substantial period of time." The information gathered during the investigation was represented as having been "substantially corroborated by witness testimony" and "credible." Addressing Mr. Hill's behavior, the Memo described him as exhibiting "a consistent pattern of inappropriate behavior . . . over a long period of time." TDEC determined that Mr. Hill would be separated from employment based on the "available and credible information," and DOHR affirmed the result.

Mr. Hill's Complaint presents an alternative and dramatically divergent narrative. He asserts L.B. "never filed any claim of sexual harassment," that the State fabricated this claim of sexual harassment, and that any other allegations of sexual harassment were also fabricated. Mr. Hill asserts that another TDEC employee told Mr. Hill that she had been interviewed by Brian Clifford, Assistant General Counsel for TDEC, in February 2019 and that she felt Mr. Clifford was coercing her into making a complaint against Mr. Hill. Mr. Hill alleges she was one of the other victims referenced in the Memo. Mr. Hill speculates that another of the victims is an employee who, while intoxicated, acted inappropriately toward Mr. Hill and his wife. He alleges he reported this employee to Jenny Lee Howard, Director of TDEC's Office of General Counsel, and recommended alcohol rehabilitation. He concludes that the State was also aware that this employee had not been harassed.

Regarding publication, Mr. Hill attached to the Complaint a February 28, 2019, news story that cites to the Memo and repeats some of the allegations of the Memo. The story states that four women claimed that Mr. Hill made unwelcome advances toward them and that one woman described his text messages as "disgusting." The story appears to reference the text messages between Mr. Jenkins and the unidentified state employee, asserting that messages between two state employees reveal that one employee stated that Mr. Hill had texted an employee (presumably L.B.), and "invited her to go camping with him out west." Mr. Hill is adamant that he does not enjoy camping and that there was no truth to reports that he invited L.B. to go camping with him. As noted above, he also indicated that L.B. directly informed state officials that he had not asked her to go camping with him and denied that Mr. Hill had sexually harassed her.

On February 12, 2020, Mr. Hill filed a Complaint with the Claims Commission, asserting that certain state employees published defamatory statements concerning him. The State filed an answer, a motion to dismiss, and a motion to stay discovery pending a ruling on the dismissal. To support the motion to stay, the State argued that the motion to dismiss could dispose of the case, obviating the need for discovery, and it further alleged that the discovery was for the improper purpose of harassing or embarrassing the complainants. In the alternative, the State sought a protective order protecting the identities of the complainants. Mr. Hill opposed, arguing that the discovery was relevant to his defamation claim and to a statute of limitations defense raised in the answer. The Claims Commission granted the motion to stay discovery pending an order on the motion to dismiss. Mr. Hill filed an amended Complaint after the initial motion to dismiss. He seeks

$300,000 in damages from the State.

The State filed a motion to dismiss the amended Complaint. The State asserted that the Complaint failed to state a claim for relief because it did not allege the elements of defamation. Noting that Mr. Hill is a public figure, the State argued that Mr. Hill had failed to allege specific defamatory statements, publication, and actual malice. In particular, the State read the Complaint as alleging defamation based solely on statements in the Memo. The State further contended that any defamatory statements were protected by absolute or, alternatively, by conditional privilege. The State also argued that the statute of limitations barred recovery.

Mr. Hill responded that the State's motion failed to accept the allegations in the Complaint as true. He argued that he had alleged the State published defamatory statements to the media, that the Complaint alleged actual malice, and that absolute executive privilege did not apply.[3]

The Claims Commission granted the motion to dismiss. The Claims Commission analyzed each statement in the Complaint that might furnish a basis for Mr. Hill's defamation claims. The Claims Commission concluded that any statements made prior to February 12, 2019, were time-barred, that each such statement also suffered other defects precluding relief, and that any oral statements made more than six months before the filing of the Complaint were also time-barred.

The Claims Commission concluded that an allegation that state employees "tipped off the media about Mr. Hill's departure" failed to state a claim because the statements were true and the parties making the statements were not identified. The Claims Commission concluded that a response by Eric Ward to a public records request from the media was not defamatory as a matter of law and was true. The Claims Commissioner rejected any claim that the State continued to publish false statements that the allegations had been corroborated because there was no specific statement or speaker identified, because the allegation "is pure hearsay and speculation," and the claim was time-barred to the extent it was oral. The Claims Commission further rejected the claim that Mr. Ward described the texts as "disgusting" to the media, again noting that the allegation did not identify the recipient of the statement and concluding it was not defamatory as a matter of law and time-barred to the extent it was oral. The Claims Commission found that any allegation involving Ryan Jenkins and a text message describing Mr. Hill's communications as "inappropriate" was not defamatory as a matter of law. Regarding the Memo, the Claims Commission concluded that absolute executive privilege should apply. The Claims Commission also concluded that the Memo was not defamatory because Mr.

---

[3] In addition to addressing other arguments raised by the State, Mr. Hill argued below that he merely had to show negligence in the defamatory statements. He does not raise this argument on appeal. Accordingly, we do not consider this contention.

Hill's claim was premised on a negligent investigation, which is insufficient to establish actual malice. Furthermore, it concluded that the statements in the Memo were true, and it determined that Mr. Hill would be unable to establish actual malice because the Complaint acknowledged a conversation occurred with L.B., because the text messages "could constitute sexual harassment," and because the Complaint acknowledges that TDEC spoke with other employees.

We note that Mr. Hill does not challenge the Claims Commission's determination that he did not bring any cause of action premised on the State's failure to follow its own internal policies. Additionally, he has not raised any challenge in relation to materials that he was not provided in accordance with a public records request. He also does not challenge the Claims Commission's determinations that the statute of limitations bars some of the purportedly defamatory statements.

Mr. Hill does challenge the Claims Commission's dismissal of his complaint. He grounds his appeal upon three purported errors by the Claims Commission. One, he asserts that the Claims Commission erred in concluding that he failed to adequately plead a defamation claim. Two, he asserts that the Claims Commission erred in determining that the statements in the Investigation Summary Memorandum are protected by absolute executive privilege. Three, he asserts that the Claims Commission erred in denying him discovery to address any deficiencies in the specificity of his pleading and by dismissing his complaint based upon deficiencies that he was not allowed to remedy through discovery.

II.

Mr. Hill brought an action for defamation, and this action was dismissed by the Claims Commission for failure to state a claim. *See* Tenn. Code Ann. § 9-8-307(a)(1)(R) (giving the Claims Commission jurisdiction over claims for libel or slander involving state employees "acting within the scope of employment"). A motion to dismiss for failure to state a claim upon which relief can be granted under Tennessee Rule of Civil Procedure 12.02(6) challenges only the legal sufficiency of the complaint, not the strength of the plaintiff's proof or evidence. *Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d 422, 426 (Tenn. 2011). A ruling upon a motion to dismiss for failure to state a claim presents a question of law, and this court's review is de novo with no presumption of correctness. *Reliant Bank v. Bush*, 631 S.W.3d 1, 6-7 (Tenn. Ct. App. 2021); *Byrd v. State*, 150 S.W.3d 414, 417 (Tenn. Ct. App. 2004) ("We review a dismissal by the Claims Commission under Rule 12.02 for lack of subject matter jurisdiction and for failure to state a claim *de novo* with no presumption of correctness.").

The complaint should only be dismissed "when it appears that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief." *Elvis Presley Enters. v. City of Memphis*, 620 S.W.3d 318, 323 (Tenn. 2021) (quoting *Crews v. Buckman*

*Labs. Int'l, Inc.*, 78 S.W.3d 852, 857 (Tenn. 2002)). When engaging in this analysis, Tennessee courts are "required to take the relevant and material factual allegations in the complaint as true and to construe liberally all allegations in favor of the plaintiff." *Lind v. Beaman Dodge, Inc.*, 356 S.W.3d 889, 894 (Tenn. 2011). Additionally, the plaintiff receives the benefit of reasonable inferences that can be drawn from the pleaded facts. *Webb*, 346 S.W.3d at 426. However, "courts are not required to accept as true assertions that are merely legal arguments or 'legal conclusions' couched as facts." *Id*. at 427 (quoting *Riggs v. Burson*, 941 S.W.2d 44, 47-48 (Tenn. 1997)). To dismiss based upon failure to state a claim, the motion must be based on the premise that all the material allegations of the complaint, even if true, do not constitute a cause of action. *Lanier v. Rains*, 229 S.W.3d 656, 660 (Tenn. 2007).

Mr. Hill challenges the Claims Commission's dismissal of his Complaint for failure to state a claim. He asserts that the Claims Commission did not accept the allegations in the Complaint as true. In particular, he takes issue with statements in the order that "it is undisputed the events which initiated Mr. Hill's recrimination did occur," that the text messages between Mr. Hill and L.B. constitute harassment, that there was an investigation, that Ms. Farmer was merely writing down the determinations of the Commissioner, and that TDEC conducted an investigation. The State responds that Mr. Hill failed to plead all the elements of defamation for each allegedly defamatory statement and that the motion to dismiss was properly granted. The Claims Commission examined the Complaint for allegations of defamation, and it concluded that, for each potentially defamatory statement, Mr. Hill either failed to file within the statutory time period or failed to allege all the necessary elements.[4] Because our review is de novo, we likewise review the Complaint to determine if Mr. Hill has alleged a prima facie case of defamation. In doing so, we take all "the relevant and material factual allegations in the complaint as true." *Lind*, 356 S.W.3d at 894.

If even one allegedly defamatory statement survives as a viable claim, then the dismissal of Mr. Hill's complaint as a matter of law would be in error. On appeal, the parties do not dispute that Mr. Hill is a public figure. "Public figures who desire to pursue defamation actions bear a heavy burden of proof because of our society's commitment to the principle that 'debate on public issues should be uninhibited, robust, and wide-open.'" *Tomlinson v. Kelley*, 969 S.W.2d 402, 405 (Tenn. Ct. App. 1997) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). To establish a prima facie case of defamation of a public figure, the plaintiff must show that a party (1) published a statement (2) concerning the plaintiff and that (3) the statement was made with actual malice, that is,

---

[4] Mr. Hill asserts on appeal that the Claims Commission "did not address the allegations" in certain paragraphs of the Complaint. Many of these paragraphs do not allege defamatory acts but include background information which is sometimes relevant to the claims. It is not clear how Mr. Hill believes the Claims Commission should have "addressed" these paragraphs, but we note that in reviewing the motion to dismiss, we have taken all the allegations of the Complaint as being true for purposes of this appeal.

"either 'with knowledge that the statement [was] false and defaming' . . . or 'with reckless disregard for the truth of the statement.'" *Charles v. McQueen*, 693 S.W.3d 262, 280 (Tenn. 2024) (quoting *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999)).

"Malice" in general usage is defined as a desire to inflict harm,[5] but actual malice in the context of defamation means something different. Actual malice does not turn on "personal ill will, hatred, spite, or desire to injure; rather, it is limited to statements made with knowledge that they are false or with reckless disregard to their truth or falsity." *Hibdon v. Grabowski*, 195 S.W.3d 48, 63 (Tenn. Ct. App. 2005) (citing *McWhorter v. Barre*, 132 S.W.3d 354, 365 (Tenn. Ct. App. 2003)).

Establishing actual malice is, nevertheless, "a steep hill to climb." *Charles*, 693 S.W.3d at 266. The showing of actual malice must be made by clear and convincing evidence. *Id*. at 280. "A speaker's failure to thoroughly investigate a claim, without more, does not establish actual malice." *Id*. Rather, evidence indicating actual malice could include proof that "the defendant 'entertained serious doubts' about the truth of her publication," that "the speaker purposefully avoided learning whether her allegations were true," or "that the statement was 'so inherently improbable that only a reckless [individual] would have put [it] in circulation.'" *Id*. at 281 (first quoting *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989); then quoting *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968)).

The Claims Commission dismissed the action in part for failure to allege defamatory content. Whether a statement is capable of defamatory meaning is a question of law. *McWhorter*, 132 S.W.3d at 364. The statement should be evaluated in the context in which it is made and as a person of ordinary intelligence would understand it in light of the surrounding circumstances. *Revis v. McClean*, 31 S.W.3d 250, 253 (Tenn. Ct. App. 2000); *see Pate v. Serv. Merch. Co., Inc.*, 959 S.W.2d 569, 574 (Tenn. Ct. App. 1996) ("The proper question is whether the meaning reasonably conveyed by the published words is reasonably understood in a defamatory sense by the reader or listener"). A statement cannot be defamatory unless it constitutes a serious threat to the plaintiff's reputation. *Stones River Motors, Inc. v. Mid-S. Pub. Co.*, 651 S.W.2d 713, 719 (Tenn. Ct. App. 1983), *abrogated on other grounds as recognized by Zius v. Shelton*, No. E1999-01157-COA-R3-CV, 2000 WL 739466, at *3 (Tenn. Ct. App. June 6, 2000)). A statement that is merely "annoying, offensive or embarrassing" is not enough to carry liability for defamation; instead, "[t]he words must reasonably be construable as holding the plaintiff up to public hatred, contempt or ridicule," carrying with them an element of disgrace. *Id*. "The extrinsic facts cannot be stretched to give the words a defamatory meaning that is not implied by the words." *Pate*,

---

[5] *See, e.g.*, *Malice*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/malice (defining malice in part as the "desire to cause pain, injury, or distress to another").

959 S.W.2d at 574.

A statement is not defamatory unless it can "reasonably [be] interpreted as stating actual facts about an individual." *Hibdon*, 195 S.W.3d at 63 (quoting *Milkovich v. Lorain Journal*, 497 U.S. 1, 21 (1990)). However, "[o]pinions are not automatically protected by the United States Constitution." *Revis*, 31 S.W.3d at 253. Instead, "an opinion may be actionable if the communicated opinion may reasonably be understood to imply the existence of undisclosed defamatory facts justifying the opinion." *Id.* (citing Restatement (Second) of Torts § 566 (1977)).

When the defamatory statement is spoken, it is slander; when written, it is libel. *Hibdon*, 195 S.W.3d at 58. "[T]he basis for an action for defamation, whether it be slander or libel, is that the defamation has resulted in an injury to the person's character and reputation." *Davis v. The Tennessean*, 83 S.W.3d 125, 128 (Tenn. Ct. App. 2001) (quoting *Quality Auto Parts Co., Inc. v. Bluff City Buick Co., Inc.*, 876 S.W.2d 818, 820 (Tenn. 1994)). Accordingly, the statements at issue must "constitute a serious threat to the plaintiff's reputation," and must be "reasonably construable as holding the plaintiff up to public hatred, contempt, or ridicule." *Id.* at 128 (quoting *Stones River Motors*, 651 S.W.2d at 719). The plaintiff "must be able to show that his or her standing in the community and his public reputation for character has been injured by the inaccurate statement and, further, must have suffered real or actual damages due to that loss of standing or reputation." *Id.* at 130.

The Claims Commission properly noted that Mr. Hill's complaint "asserts a single cause of action for defamation based on various allegations of slander and libel." Addressing the various allegations of defamation, via slander and libel, the Claims Commission ultimately dismissed Mr. Hill's amended complaint. Noting the six-month statute of limitations related to slander, the Claims Commission concluded that any oral statements could not form a basis for a viable defamation complaint because they were untimely. On appeal, Mr. Hill has failed to note any oral statements that were made within the statute of limitations. As for the one-year statute of limitations for libel, with regard to any written statement prior to February 12, 2019, the Claims Commission similarly concluded that these written statements could not form a basis for a viable defamation complaint because they were untimely. Mr. Hill has not challenged these conclusions by the Claims Commission; accordingly, Mr. Hill may only rely upon written statements on or after February 12, 2019, as purported defamation.

For all such statements, the Claims Commission concluded that Mr. Hill had failed to adequately plead defamation. The Claims Commission also concluded that, insofar as Mr. Hill's claim rested upon Deputy Commissioner Farmer's Investigation Summary Memorandum (Memo) of February 26, 2019, absolute immunity applies to the Deputy Commissioner's statements.

A.

Turning first to the Memo, we note that the Memo is in writing; that it is dated February 26, 2019; and that the complaint attaches an article written by reporter Jeremy Finley on February 28, 2019, which references the Memo. It does not appear that the parties dispute that there was publication of the statements in the Memo or that the publication fell within the limitations period. The Claims Commission's conclusion that the Memo could not form a basis for a defamation claim was predicated upon the contention that it did not include any false defamatory statements made with actual malice. The Memo sets forth the following:

**Investigation Summary Memorandum**
**IN RE: Richard (Brock) Hill**
**Bureau of Parks and Conservation**
**Department of Environment & Conservation**

1. **Initiation of Investigation**

   On February 6, 2019, a Department of Environment and Conservation ("TDEC") female staff member provided verbal notice to TDEC's management of her complaint of inappropriate behavior against Richard (Brock) Hill, Deputy Commissioner. On February 7, 2019, TDEC's management notified TDEC's Director of People and Organizational Development ("TDEC HR") and TDEC's Office of General Counsel ("OGC") of the verbal complaint. TDEC's HR and OGC immediately contacted the complainant to determine whether the allegations fell under the State's policy on Workplace Discrimination and Harassment, DOHR Policy 12-008 (State's Policy). During the review, TDEC becoming aware of three additional complaints from other TDEC staff against Mr. Hill. On February 8, TDEC informed the Department of Human Resources (DOHR) of the allegations and initial findings. Because the allegations involved a Deputy Commissioner, DOHR, pursuant to the State's Policy conducted a review of TDECs analysis.

2. **Description of Complaints**

   Four TDEC employees allege that they were subjected to unwelcomed verbal and physical conduct by Mr. Hill. The allegations, which have happened over a substantial period of time and in some cases over years, stem from sexually charged comments, and unwelcomed advances. The complainants all stated that they did not feel they could report their complaints because of fear of retaliation and job loss because Mr. Hill was a Deputy Commissioner. While Mr. Hill was not the direct supervisor of any Complainant, he had

- 11 -

authority over the conditions of employment of each complainant as Deputy Commissioner over the Bureau in which they worked.

3. **Summary of Evidence and Conclusion**

The information gathered during the investigation, which was substantially corroborated by witness testimony and complainants' statements showed a consistent pattern of inappropriate behavior by Mr. Hill over a long period of time. TDEC's leadership, on February 8, 2019, determined that it was appropriate to separate Mr. Hill's employment from state service. TDECs leadership felt there was no scenario in which Mr. Hill could remain employed at TDEC based on the available and credible information gathered at that time and the obligation to act promptly and appropriately under the circumstances. As an executive service employee, Mr. Hill serves at the pleasure of the appointing authority and does not have the ability to appeal a dismissal. (See Tenn. Code Ann. 8-30-202). Based on the review, DOHR affirms the results.

Mr. Hill asserts the Memo is defamatory on a variety of bases. He alleges that the state employees involved in this matter were aware that the allegations against him were false and aware that the purported allegations were not even actual allegations. For example, Mr. Hill indicated in his complaint that L.B. expressly informed the state investigator that she was not harassed and that the "crush" comment had just been a joke. He alleges that L.B. was fired from state employment because she refused to support false allegations that he committed sexual harassment. Mr. Hill further alleges that no true investigation had occurred, merely a sham investigation, and that state employees were aware that this was a sham investigation rather than a real investigation. Mr. Hill also alleges that despite state employees knowing that he had engaged in no misconduct, despite their knowledge of an absence of any actual allegations of sexual harassment, and despite their failure to conduct any real investigation, the Memo advanced known falsehoods to the public via the media that he engaged in sexual harassment of multiple women and that these allegations had been corroborated through a real investigation.

The Claims Commission concluded as a matter of law that Mr. Hill failed to state a claim of defamation in relation to the Memo. In reaching this conclusion, the Claims Commission observed regarding the communication between Mr. Hill and L.B. that "Mr. Hill would like to frame the discussion as routine banter between a high-ranking state official and a lower-level employee" but that "the conversation left a different impression with [L.B.]" Mr. Hill, however, alleges — and for purposes of motion to dismiss, we must assume that allegation to be true — that L.B. did not have a different impression. In fact, he alleges that L.B. informed investigators that she had not been sexually harassed and that L.B. was threatened by state officials and lost her state job because she failed to support the development of a false case against Mr. Hill. The Claims Commission also interpreted

all the communications between Mr. Jenkins and other state officials regarding sexual harassment allegations stemming from L.B. as being in good faith. Quite possibly they were, but again, Mr. Hill has alleged that Mr. Jenkins and other state officials knew there was no actual sexual harassment and misrepresented that there was, and that state officials also knew any allegations of sexual harassment were false. Again, for purposes of a motion to dismiss, we must assume that Mr. Hill's allegations in his complaint are true.

Furthermore, the Claims Commission concluded "the events between [L.B.] and Mr. Hill did occur. As such, any alleged defamatory statements originating from a subsequent investigation originating from the February 6, 2019 conversation is not a false statement." We cannot agree. Mr. Hill's complaint alleges that the state officials knew the allegations were false, coerced state employees into making false allegations, and knowingly disseminated these false allegations. These are, of course, merely allegations from Mr. Hill and at present there is no evidence in support of his assertions, but again for purposes of a motion to dismiss, we must accept these allegations as true.

Accordingly, we cannot agree that the Memo does not contain any purported false statements. The Memo advances allegations of sexual harassment that Mr. Hill contends never occurred. The Memo asserts corroboration that Mr. Hill alleges did not occur. Furthermore, Mr. Hill's allegations regarding the sham nature of the investigation constitute allegations of actual malice, as he contends the investigation revealed no misconduct but the State nevertheless claimed the investigation revealed misconduct and thereby reinforced a sense of his culpability with the public by noting that the conclusion was reached after an investigation. There is no dispute that the Memo was published within the relevant timeframe.

Because we have determined that Mr. Hill has stated a claim in relation to the Memo, we turn to the Claims Commission's alternative basis for dismissing the cause of action to the extent that it was based on the Memo. The Claims Commission concluded that the State's publication of the Memo was protected by absolute executive privilege, reasoning that Ms. Farmer merely "placed into writing the topic of the meeting on February 8, 2019, with Commissioner Salyers related to the termination of Mr. Hill." Mr. Hill asserts that the Claims Commission erred in applying absolute executive privilege to the Memo. He argues that Ms. Farmer, as a Deputy Commissioner, could not rely on the privilege. The State contends that Ms. Farmer is an executive official and that she should be afforded immunity under *Jones v. State*, 426 S.W.3d 50 (Tenn. 2013). We review the Claims Commission's determination as to this issue de novo. *Burns v. State*, 601 S.W.3d 601, 606 (Tenn. Ct. App. 2019) (noting that whether absolute privilege applies is a question of law).

"A privilege is described as absolute when it is not defeated by the defendant's malice, ill-will, or improper purpose in publishing the defamatory communication." *Simpson Strong-Tie Co., Inc. v. Stewart, Estes & Donnell*, 232 S.W.3d 18, 22 (Tenn. 2007) (footnote omitted) (citing Dan B. Dobbs, *The Law of Torts* 1153 (2000)). Thus, "[a]bsolute

privileges shield a defendant from liability for defamatory statements even when made with ill will, malice or some other improper purpose." *Jones*, 426 S.W.3d at 53. Such privilege amounts to complete immunity. *Simpson Strong-Tie Co.*, 232 S.W.3d at 22. The rationale underlying a grant of absolute privilege to executive officials is that:

> it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties.

*Jones*, 426 S.W.3d at 54 (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949)). Absolute privilege functions to prevent "suits which would consume time and energies which would otherwise be devoted to governmental service and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration of policies of government." *Barr v. Matteo*, 360 U.S. 564, 571 (1959). Furthermore, the public has an interest in its public officials' unfettered speech because "[t]he effective functioning of a free government like ours depends largely on the force of an informed public opinion." *Jones*, 426 S.W.3d at 54 (quoting *Barr*, 360 U.S. at 577 (Black, J., concurring)).

In *Jones*, striking "the balance in favor of encouraging public officials to speak with complete candor—and without fear of legal recourse—with respect to their official duties," the Tennessee Supreme Court adopted an absolute privilege from claims of defamation for cabinet-level executive officers who have made statements within the scope of their official duties. *Jones*, 426 S.W.3d at 56 (quoting *Gold Seal Chinchillas, Inc. v. State*, 420 P.2d 698, 701 (Wash. 1966)). The Court reasoned that "[s]uch officials must have the flexibility to make important decisions free from fear that they will have to defend themselves from lawsuits" and that "[u]ninhibited communication with the public about governmental affairs is essential and must be protected." *Id.* at 56. The Court also noted that such absolute privilege is afforded to the judicial and legislative branches of government. *Id.* at 56-57 (citing *Lea v. White*, 36 Tenn. (4 Sneed) 111 (1856); Tenn. Const. art. II, § 13). *Jones* specifically concluded that the actual malice standard was insufficient to avoid the "unacceptable consequence of forcing such officials to waste precious time responding to lawsuits rather than discharging their public duties." *Id.* at 57.

Here, we are presented with the acts of a Deputy Commissioner. The Tennessee Supreme Court in *Jones* explicitly pretermitted the question of whether absolute immunity extends beyond cabinet-level officials. *Jones*, 426 S.W.3d at 56 n.7. *Jones* cited to the Restatement in reaching its conclusion that cabinet-level officers enjoy absolute privilege to utter defamatory material. *Id.* at 56. The Restatement also addresses lower-level officers:

> *c.* All of the state courts that have considered the question have agreed that

the absolute privilege stated in Clause (b) protects the superior officers of the state governments, including at least the governor, the attorney-general or the heads of state departments whose rank is the equivalent of cabinet rank in the Federal Government. A good number of the States have gone further, and have extended the absolute privilege to state officers of various ranks below that of cabinet level. The greater number of the state courts have not made the extension to the point of the federal rule and some have expressly confined the absolute privilege to superior officers of the States. This leaves the inferior state officers in these States with only a conditional privilege . . . .

Restatement (Second) of Torts § 591, cmt. c (1977).

The statements at issue here were made by Ms. Farmer, not by Commissioner Salyers. The parties agree that Ms. Farmer is not a cabinet-level officer. Mr. Hill argues that accordingly, the statements are not entitled to absolute immunity, relying on *Burns v. State*, 601 S.W.3d 601 (Tenn. Ct. App. 2019).

In *Burns*, a District Attorney General made allegedly defamatory statements regarding a police detective. *Burns*, 601 S.W.3d at 602-03. This court noted that *Jones* had extended the privilege only to cabinet-level officers. *Id.* at 611 (emphasizing that *Jones* extended absolute privilege to cabinet-level officers for statements made within the scope of their official duties). *Burns* further cited the Restatement, which specifically noted in an illustration that a district attorney would only have a conditional privilege. *Id.* at 612 (quoting Restatement (Second) of Torts § 591, cmt. f. illus. 4). Ultimately, *Burns* rejected absolute privilege for district attorney generals because *Jones* specifically relied on the responsibility of cabinet-level officers to "formulate official policy," *Id.* at 613 (quoting *Jones*, 426 S.W.3d at 56), and because "the statutory duties of district attorneys general do not include formulating official policy at the state level." *Id.* at 614. Furthermore, *Burns* noted that it was "not persuaded that this minority view should sway us from the confines of the Tennessee Supreme Court's adoption of the Executive Official Privilege as limited to cabinet-level or high-ranking state executive officials." *Id. at* 615. Accordingly, after the *Jones* Court explicitly pretermitted the question of whether absolute executive privilege should extend beyond cabinet-level officials, the *Burns* Court concluded that absolute executive privilege would not extend below "high-ranking" state officials and that the privilege did not immunize district attorneys general. *Id.*

In reaching its decision that absolute immunity applied, the Claims Commission extended absolute immunity in a manner beyond where most states have gone, according to the Restatement. *See* Restatement (Second) of Torts § 591, cmt. c. (1977). The extension of immunity is a matter of significant consequence, as it places an official beyond the reach of otherwise applicable law.

States have taken a variety of approaches to absolute immunity for executive

- 15 -

officers from immunizing all discretionary decisions, to granting absolute immunity to high-level officers, to extending immunity to lower-level executive employees, to granting only qualified immunity to even high-ranking state officials.  Dan B. Dobbs, Paul T. Hayden and Ellen M. Bublick, *The Law of Torts* § 541 (2d ed.); *Aspen Expl. Corp. v. Sheffield*, 739 P.2d 150, 159-60 (Alaska 1987) (concluding that "to strike a balance between the public's interest in efficient, unflinching leadership and the interests of maliciously injured parties," whether immunity is absolute or qualified should be evaluated under the following factors: (1) the nature and importance of the officer's function to the administration of government; (2) the likelihood that the officer will be subjected to frequent accusations of wrongful motives and the ease of defending against accusations; and (3) the availability of other remedies); *Chamberlain v. Mathis*, 729 P.2d 905, 912 (Ariz. 1986) (holding that cabinet-level official was entitled to qualified immunity, as that adequately served the policy purposes behind immunity); *Harlow v. State Dep't of Human Servs.*, 883 N.W.2d 561, 571-72 (Minn. 2016) (the privilege extends to high-level state government officials); *Lowell v. Medford Sch. Dist. 549C*, 515 P.3d 359, 366-67 (Or. 2022) (affording absolute privilege to executive officers performing discretionary acts, when the public's interest outweighs the individual's right to redress); *Liberty Bank of Seattle, Inc. v. Henderson*, 878 P.2d 1259, 1269-70 (Wash. Ct. App. 1994) (applying absolute immunity to the state supervisor of banking and the conservator imbued with his power).

In determining how far to extend immunity, courts, generally, look at the underlying rationale of immunizing executive officials.  Courts have observed that the potential for liability may make officials "unduly timid in carrying out their official duties."  *D.C. v. Jones*, 919 A.2d 604, 607 (D.C. 2007) (quoting *Westfall v. Erwin*, 484 U.S. 292, 295 (1988), *superseded by statute as recognized by Hernandez v. Mesa*, 589 U.S. 93, 111 (2020)).  Accordingly, courts accept the possibility that some meritorious claims will be unredressed only when the privilege is "essential to effective governance." *Lowell*, 515 P.3d at 367.  Privilege has been extended to officials entrusted with "administrative or executive policy-making responsibilities of considerable dimension," who "bear the greatest burdens of government" and must "be insulated from the harassment and financial hazards that may accompany suits for damages by the victims of even malicious libels or slanders." *Stukuls v. State*, 366 N.E.2d 829, 833 (N.Y. 1977).  Allowing a governmental official to speak freely may ultimately serve the goal of holding such an official accountable since such an official "should be free to speak on matters relating to the operation of the agency without fear of civil liability."  *Harlow*, 883 N.W.2d at 571-72.  Without such immunity there is a risk that "lawsuits would consume time and energy that would otherwise be devoted to governmental service" and that the threat of suit "might inhibit the vigorous administration of governmental policy." *Liberty Bank of Seattle, Inc.*, 878 P.2d at 1268.  In order to avoid a situation in which "public officials would be unduly hampered, deterred and intimidated in the discharge of their duties," absolute immunity has been extended to promote "fearless, vigorous and effective administration of government." *Aspen Expl. Corp.*, 739 P.2d at 157-58 (footnote omitted) (quoting *Barr*, 360 U.S. at 571).  An official governing under threat of suit may be tempted to "elevate

personal interest above official duty" and qualified individuals may avoid public service. *Chamberlain*, 729 P.2d at 908-09. The doctrine of absolute immunity is built on the premise that "it is not a tort for government to govern." *Aspen Expl. Corp.*, 739 P.2d at 158-59 (quoting *Dalehite v. United States*, 346 U.S. 15, 57 (1953) (Jackson, J., dissenting)).

The rationale behind protecting the executive functions of government is balanced, however, against the competing interest of the harm that might be suffered by citizens. Courts analyze whether "society's concern to shield the particular government function at issue from the disruptive effects of civil litigation requires subordinating the vindication of private injuries otherwise compensable at law." *D.C. v. Jones*, 919 A.2d at 609 (quoting *Moss v. Stockard*, 580 A.2d 1011, 1021 (D.C. 1990)) (relying on a nonexclusive list of four factors: "(1) the nature of the injury, (2) the availability of alternative remedies, (3) the ability of the courts to judge fault without unduly invading the executive's function, and (4) the importance of protecting particular kinds of acts"). Courts seek to avoid allowing "unscrupulous officials to cause personal injury that cannot be redressed." *Id.* at 612. After all, "[p]rotecting public employees from harassment is not the policy end for which the absolute privilege is designed. Protecting public employees, is, instead, a means to ensure good governance by fearless officials." *Lowell*, 515 P.3d at 367. Unfettered privilege might "place in the power of revengeful and unscrupulous persons the right to malign at will those who had incurred their displeasure, and allow the traducer to scatter without stint scandalous and defamatory matter about all who might come within the circle of his enmity." *Id.* (quoting *Tanner v. Stevenson*, 128 S.W. 878, 881 (Ky. 1910)). "[T]o cloak public officers who do not have such a need with the privilege to wrongfully vilify others with impunity while their critics remain fully liable for their own tortious communications, would tend to squelch criticism of government by its citizens while serving no sufficiently countervailing public purpose." *Stukuls*, 366 N.E.2d at 833. "[T]here is a strong public policy of protecting citizens from oppressive and malicious acts," *Aspen Expl. Corp.*, 739 P.2d at 159, and all individuals, even governmental officials, are presumed to be subject to the law, *Chamberlain*, 729 P.2d at 909. Limits on immunity exist so that victims may be compensated and wrongdoers deterred. *Id.*

In *Harlow v. State Department of Human Services*, the Minnesota Supreme Court extended absolute executive privilege to a Deputy Commissioner. *Harlow*, 883 N.W.2d at 572. It did so based on statutory authority that the Deputy Commissioner possessed all the powers and authority of the Commissioner and therefor functioned as a top-level cabinet-equivalent official. *Id.* at 572-73; *see also Harlow*, 883 N.W.2d at 577-78 (Anderson, J., dissenting) (concluding that the Deputy Commissioner should not have absolute privilege because she did not possess the rank of a cabinet-level official even if she had the power and because the selection process for deputy commissioners did not lead to the conclusion that she was best held accountable through the political process); *Chamberlain*, 729 P.2d at 907-08 (concluding after an examination of statutory authority that the official was the equivalent of a federal cabinet officer).

- 17 -

In Tennessee, our determination in *Burns* regarding immunity hinged on an inquiry into whether executive officials formulated official policy at the state level. *Burns*, 601 S.W.3d at 614. *Jones* likewise reasoned that immunity should extend to the Governor's Cabinet because these executive officers "formulate official policy," "exercise significant supervisory authority in conducting state business," and require "the flexibility to make important decisions free from fear that they will have to defend themselves from lawsuits." *Jones*, 426 S.W.3d at 56.

This appeal comes to us on a motion to dismiss, and the State has pointed us to no authority that would allow us to conclude that Ms. Farmer is a high-level governmental official who formulates official policy on the State level. The office of Deputy Commissioner is by statute an executive service position, along with positions such as "[w]ardens and directors of correctional facilities," or a "licensed attorney engaged in the practice of law and representing the state in such capacity." Tenn. Code Ann. § 8-30-202(a)(2), (4), (8). The Commissioner by statute has the ability to "[a]ppoint such departmental employees, experts, and special assistants as may be necessary to carry out this chapter" and "appoint a designee as they deem necessary to act within the scope of this chapter." Tenn. Code Ann. § 8-30-104(a)(5), (c). DOHR regulations also mandate that, in a complaint against an executive-level employee, the Department of Human Resources, Office of General Counsel, EEO Division "will investigate the complaint on behalf of the department and report the results to the appropriate agency or authority." Tenn. Dep't of Human Resources, Policy 12-008 (2012), available at https://www.tn.gov/content/dam/tn/hr/policy/DOHRPolicy12-008.pdf.

The State asserts that "Deputy Commissioner Farmer is an executive official, while a local district attorney is not," but it provides no support beyond Policy 12-008 for that premise. There is nothing in the record to clarify the duties of Ms. Farmer as a Deputy Commissioner or why those in her position require "the flexibility to make important decisions free from fear that they will have to defend themselves from lawsuits," *Jones*, 426 S.W.3d at 56, such that recourse should be denied to an injured citizen even if the government actor's conduct is unscrupulous.

In other jurisdictions, courts have based a determination of immunity on clearly delineated, statutory duties. *See, e.g., Harlow*, 883 N.W.2d at 572. The parties have cited to no such authority in this case. Other courts have recognized that while "the question of absolute immunity should be determined at the outset of the litigation," "sometimes discovery will be necessary." *D.C. v. Jones*, 919 A.2d at 610 (concluding that, in that case, discovery was not necessary because the facts were evident from the complaint and the nature of the mayor's office); *c.f. Ind. State Dist. Council of Laborers v. Brukardt*, No. M2007-02271-COA-R3-CV, 2009 WL 426237, at *6 (Tenn. Ct. App. Feb. 19, 2009) (noting that a "complaint is subject to dismissal under rule 12.02(6) for failure to state a claim if an affirmative defense clearly and unequivocally appears on the face of the complaint" (quoting *Givens v. Mulliken ex rel. Estate of McElwaney*, 75 S.W.3d 383, 404

(Tenn. 2002), *superseded by statute on other grounds as recognized in Willeford v. Klepper*, 597 S.W.3d 454, 462 (Tenn. 2020))).

Where executive branch officials are asserting absolute immunity, the burden of establishing that absolute immunity should apply rests upon the officials. *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (stating that "the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question"); *Cooperrider v. Woods*, 127 F.4th 1019, 1027 (6th Cir. 2025) (noting that "[t]he burden of justifying absolute immunity rests on the official asserting the claim" (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 812 (1982)); *Churchill v. Univ. of Colo. at Boulder,* 285 P.3d 986, 1001 (Colo. 2012) (observing that "[o]fficials who seek [absolute immunity] have the burden of showing that such an exemption is justified by overriding considerations of public policy" (quoting *Forrester v. White*, 484 U.S. 219, 224 (1988))); *Diorio v. Hines Rd., LLC*, 226 A.3d 138,  (R.I. 2020) (indicating that  "[t]he immunity-seeker must carry the devoir of persuasion to show that an immunity applies" and that "[t]hat burden is a heavy one" (internal citations omitted)); 67 C.J.S. Officers § 341 (declaring that "[t]he burden is on the official claiming immunity to demonstrate that public policy requires recognition of an absolute immunity"); *Prosser and Keeton on the Law of Torts* 1060 (W. Page Keeton et al. eds., 5th ed. 1984) (addressing absolute immunity of state executive officials and noting that "[t]he burden in any event is upon the officer to prove entitlement to immunity").

The showing in the present case is far too thin to support extending absolute immunity beyond where the Tennessee Supreme Court has gone, reaching so as to encompass the Deputy Commissioner.  Our decision on the issue of absolute immunity is a narrow one.  We have not determined that absolute immunity does not apply to the Deputy Commissioner but instead that the State has not at this point upon this record met its burden to justify a further extension of absolute immunity.  In reaching this conclusion, we emphasize the exceedingly thin nature of the development of the record as to the role and responsibility of the Depuy Commissioner, which creates significant complications for this court in considering whether absolute immunity should apply to her.

B.

While our conclusions in relation to the Memo are in and of themselves sufficient to warrant reversal of the Commission's grant of a motion to dismiss, given that the statements contained in the Memo are potentially subject to a defense of absolute immunity, we proceed to consider whether there are any other allegedly defamatory statements sufficient to set forth a claim for defamation outside of those statements contained in the Memo.  Turning to the purportedly defamatory statements outside the Memo, Mr. Hill makes a specific allegation regarding emails sent by a TDEC employee to a reporter.

Mr. Hill alleges that state employee Mr. Ward made defamatory statements in his emails to reporter Jeremy Finley on February 13, 2019. Mr. Hill asserts that Mr. Ward wrote the following two emails to news reporter Mr. Finley:

Jeremy,

I can confirm that TDEC separated former Deputy Commissioner Brock Hill from State service following an investigation into complaints of workplace misconduct. We'll get started on processing your request for records.

-Eric

. . .

Jeremy,

There are no public records available at this time specific to the claims or investigation into allegations of workplace misconduct against Mr. Hill. We are working to produce his personnel file and the separation letter. We should be able to get those to you this week.

Thanks,
Eric

Mr. Hill's alleges in his Complaint that these emails were defamatory because they stated : "1) [that] Hill was separated after an investigation of workplace misconduct; and (2) that there was an actual investigation, and (3) that the investigation had revealed that Mr. Hill was guilty of misconduct." Mr. Hill alleges that he "was separated before any investigation took place," that "the investigation was a sham," and that "no reasonable person could have believed that Mr. Hill was guilty of misconduct." He also alleges that Mr. Ward knew the allegations of sexual harassment were untrue and that the investigation into his conduct was a sham. Mr. Hill alleges that Mr. Ward acted with actual malice in disseminating information to the contrary.

A court can determine that a statement is not defamatory as a matter of law only when "the statement is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense." *Aegis Sciences Corp. v. Zelenik*, No. M2012-00898-COA-R3-CV, 2013 WL 175807, at *6 (Tenn. Ct. App. Jan. 16, 2013) (quoting *Biltcliffe v. Hailey's Harbor, Inc.*, No. M2003-02408-COA-R3-CV, 2005 WL 2860164, at *4 (Tenn. Ct. App. Oct. 27, 2005)). "Words which are substantially true can nevertheless convey a false meaning whether intended by the speaker or not. The proper question is whether the meaning reasonably conveyed by the published words is reasonably understood in a defamatory sense by the reader or listener." *Pate*, 959 S.W.2d at 574.

While the circumstances around the statement cannot be "stretched" to create a defamatory meaning that the words do not imply, the literal truth of the words is not a defense if the words convey a false meaning. *Id.*; *see* 1 Law of Defamation § 4:16 (2d ed.). Although the statement from Mr. Ward does not expressly assert that Mr. Hill was found to have engaged in misconduct by a real investigation into his conduct, we must examine whether it is nevertheless capable of defamatory meaning through implication. "Defamation by implication occurs when 'the defendant juxtaposes a series of facts so as to imply a defamatory connection between them, or creates a defamatory implication by omitting facts.'" *Corey v. Pierce Cnty.*, 225 P.3d 367, 373 (Wash. Ct. App. 2010) (quoting *Mohr v. Grant*, 108 P.3d 768, 774 (Wash. 2005)); *see Memphis Pub. Co. v. Nichols*, 569 S.W.2d 412, 420 (Tenn. 1978) ("It is no defense whatever that individual statements within the article were literally true. Truth is available as an absolute defense only when the defamatory meaning conveyed by the words is true.").

We conclude that the statement that Mr. Hill was fired after an investigation into workplace misconduct is capable of defamatory meaning. The average person reasonably could understand from this statement that there was a real investigation that confirmed that there was misconduct and that the misconduct was of sufficient seriousness that it was the reason Mr. Hill was separated from employment. Accordingly, the Complaint alleges that Mr. Ward made a statement capable of defamatory meaning, that it was false because no misconduct occurred, and that the employee was aware that the statements were false because he was aware no misconduct had occurred and no real investigation had occurred. We simply cannot say as a matter of law that the emails are incapable of reasonably being understood in a defamatory sense.

As for the more generalized allegations, Mr. Hill alleges that "[o]n or about February 12, 2019, employees of TDEC, DOHR, and/or the OGC tipped off the media about Mr. Hill's departure from TDEC and spread false rumors that he had sexually harassed a coworker or coworkers." Mr. Hill also alleges that "[b]etween February 13 and February 26, 2019, TDEC, DOHR, and the OGC continued to publish false statements to the media and other third parties that the purported complaints of sexual harassment had been corroborated: which was false and defamatory. Respondents supplied that information to the media for purposes of spreading it and defaming Mr. Hill." Mr. Hill on appeal argues that the Claims Commission's denial of discovery left him in a "Kafkaesque scenario" by depriving him of the means to adequately plead facts related to the false rumors allegedly spread by state employees.

Mr. Hill's Complaint sets forth a single defamation claim. In his appellate brief, as relief for any error below, Mr. Hill seeks a reversal of the order granting the motion to dismiss and remand for further proceedings. Because we have concluded that Mr. Hill has sufficiently alleged the elements of defamation to survive a motion to dismiss, we pretermit any discussion of the generalized allegations or the Claims Commission's discovery ruling.

## III.

While Mr. Hill's complaint is not a model of clarity, we conclude that he has adequately set forth a claim of defamation and that the State has not met its burden to show that absolute executive immunity applies to the Deputy Commissioner's Memo. Ultimately, we conclude that the Claims Commission erred in dismissing Mr. Hill's Complaint. For the above discussed reasons, we reverse the dismissal of the Complaint and remand for further proceedings consistent with this opinion. Costs of the appeal are taxed to the appellee, the State of Tennessee, for which execution may issue if necessary.

_____
JEFFREY USMAN, JUDGE